UNITED STATES, Appellee

v.

Ashontia K. HARROW, Airman Basic
U.S. Air Force, Appellant

No. 06-0474

Crim. App. No. 35257

United States Court of Appeals for the Armed Forces

Argued February 14, 2007

Decided June 22, 2007

RYAN, J., delivered the opinion of the Court, in which BAKER, ERDMANN, and STUCKY, JJ., joined. EFFRON, C.J., filed an opinion concurring in part and in the result.

Counsel

For Appellant: Captain Christopher L. Ferretti (argued); Lieutenant Colonel Mark R. Strickland (on brief); Captain Christopher S. Morgan.

For Appellee: Captain Jefferson E. McBride (argued); Colonel Gerald R. Bruce, Lieutenant Colonel Robert V. Combs, and Captain Daniel J. Breen (on brief); Colonel Gary F. Spencer and Major Steven R. Kaufman.

Amicus Curiae for Appellant: Captain Alex Schneider (law student)(argued); James H. Rosenblatt, Esq. (supervising attorney) (on brief) for Mississippi College School of Law.

Amicus Curiae for Appellee: Captain Jennifer J. Bowersox (law student)(argued); Victoria A. Lowery, Esq. (supervising attorney) and Katie Akins (law student) (on brief) for Mississippi College School of Law.

Military Judge: James L. Flannery

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge RYAN delivered the opinion of the Court.

Appellant argues that three evidentiary errors during her trial require this Court to overturn her conviction for the unpremeditated murder of her infant daughter. She also alleges errors arising from her guilty plea to larceny, the United States Air Force Court of Criminal Appeals' sentence reassessment, as well as from post-trial and appellate delay. We address each of these six issues. Although we conclude that this case is not without error, we hold that the errors did not prejudice Appellant. Therefore, for the reasons stated below, we affirm the decision of the lower court.

## I.  BACKGROUND

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to her plea, of the unpremeditated murder of her infant daughter, in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918 (2000). Appellant pled guilty to violations of Articles 86, 107, 121 and 134, UCMJ, 10 U.S.C. §§ 886, 907, 921, 934 (2000), and thirteen specifications thereunder, to include: multiple failures to go, absence without leave, making a false official statement, theft of insurance proceeds, fraud in obtaining phone services, dishonorable failure to pay just debts, and making false claims to secure the approval of a loan. The sentence adjudged by the court-martial and approved by the

convening authority included a dishonorable discharge, confinement for twenty-five years, and forfeiture of all pay and allowances.

The Court of Criminal Appeals affirmed all charges except one specification of absence without leave. United States v. Harrow, 62 M.J. 649, 661-62 (A.F. Ct. Crim. App. 2006). The Court of Criminal Appeals found that Appellant's plea of guilty to the absence without leave charge was improvident and reassessed her sentence to a dishonorable discharge, twenty-four years and six months of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1.

We granted review on the following issues:

I.

WHETHER THE MILITARY JUDGE ERRED BY PREVENTING THE DEFENSE FROM IMPEACHING THE TESTIMONY OF THE DECEASED BABY'S FATHER – THE ONLY OTHER PERSON PRESENT AT THE TIME OF THE ALLEGED SHAKING INCIDENT – WITH PRIOR INCONSISTENT STATEMENTS REGARDING THE BABY'S INTERACTIONS WITH APPELLANT AND THE BABY'S CRYING AFTER APPELLANT LEFT THE HOUSE.

II.

WHETHER APPELLANT'S DUE PROCESS RIGHTS WERE VIOLATED WHEN IT TOOK OVER FOUR YEARS FOR THE ARTICLE 66 REVIEW BY THE COURT BELOW TO BE COMPLETED.

III.

WHETHER THE MILITARY JUDGE ERRED BY DENYING
A DEFENSE MOTION IN LIMINE TO EXCLUDE THE
TESTIMONY OF VARIOUS WITNESSES REGARDING
APPELLANT'S PATTERN OF MINOR PARENTAL ABUSE
WHERE THE TESTIMONY CONSTITUTED
INAPPROPRIATE CHARACTER EVIDENCE THAT WAS
UNFAIRLY PREJUDICIAL.

IV.

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING
THE PROSECUTION'S EXPERT WITNESS TO PRESENT
INADMISSIBLE PROFILE EVIDENCE THAT PLACED
APPELLANT IN THE PROFILED CATEGORY AND
EXCLUDED THE DECEASED BABY'S FATHER - THE
ONLY OTHER SUSPECT - FROM THE PROFILED
CATEGORY.

V.

WHETHER APPELLANT'S GUILTY PLEAS TO CHARGE
II AND ITS SPECIFICATION [LARCENY] WERE
PROVIDENT.

VI.

WHETHER THE AIR FORCE COURT OF CRIMINAL
APPEALS PROPERLY REASSESSED THE SENTENCE
WHEN IT INCLUDED A REDUCTION IN PAY GRADE
THAT WAS NOT ADJUDGED (OR AUTHORIZED).[1]

---

[1]  We heard oral argument in this case at the Mississippi College School of Law, Jackson, Mississippi, as part of the Court's "Project Outreach."  See United States v. Finch, 64 M.J. 118, 119 (C.A.A.F. 2006); United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).

4

## II.  FACTS

### A.  OVERVIEW

We focus first on the general background facts relevant to Appellant's conviction for the unpremeditated murder of her infant daughter, Destiny.  Destiny was taken to the hospital after suffering severe brain trauma from blunt force injury on June 23, 2000.  At the hospital doctors determined that Destiny had suffered serious brain damage consistent with shaken baby syndrome and blunt force trauma.  Five months later Destiny died from injuries inflicted that day.  She was eleven months old.

In the course of the ensuing investigation, Appellant made contradictory and incriminating statements to investigators and others.  These admissions and inconsistencies implicated her in the murder of Destiny.  Direct and circumstantial evidence regarding the timing of Destiny's injury and Appellant's consciousness of guilt, as well as expert testimony, corroborated Appellant's admissions and bolstered the prosecution's case against her.

The defense attempted to deflect culpability away from Appellant, arguing Antonio Jackson, Destiny's father, was the perpetrator.  Some evidence showed that Appellant told investigators that Destiny's death may have been an accident. Appellant did not testify and the defense called no witnesses on

the merits.  All defense evidence was developed through cross-examination of the prosecution's witnesses.

The panel was asked to decide under what circumstances, and at whose hand, Destiny died.  What follows is a summary of some of the evidence presented by the prosecution to prove the cause and circumstances of Destiny's death.

### B.  Physical Injuries to Destiny

On June 23, 2000, Destiny lived in government housing at Eglin Air Force Base, Florida, with Appellant.  Jackson, the natural father of Destiny, lived out of state, but was visiting Appellant and staying at her apartment for several days.

On the day of the incident Appellant went to work and left Destiny with Jackson.  Jackson was home with Destiny throughout the morning and she slept for most of that time.  Appellant returned to her base apartment at midday.

Shortly after she arrived home, Appellant took off her uniform and lay on the couch.  Sometime thereafter Appellant became angry with Jackson.  Appellant began arguing with Jackson.  The fighting escalated into Appellant screaming, yelling, and cursing.

At some point during the argument, Appellant picked Destiny up off the couch by one arm.  Appellant held Destiny by one arm, allowing her to flail about, throughout her tirade.  Jackson told her to be careful with the baby and not to take her anger

out on Destiny.  Appellant only became angrier.  Appellant picked up a broom and pointed it at Jackson.  She approached him, spit in his face, and continued to yell at him.

Eventually, Jackson walked away from Appellant and went into the bathroom in order to avoid the confrontation.  Appellant followed him to the bathroom and continued screaming at him.  Jackson left the bathroom and returned to the living room to avoid her.  She followed him and began to throw things at him, including Destiny's walker.

Appellant continued to scream at Jackson, and he returned to the bathroom and locked the door.  After Jackson locked himself in the bathroom, he could hear Appellant still screaming and things hitting the wall.  He turned up the radio and tried to ignore her.

At 2:50 p.m. that day, after Jackson locked himself in the bathroom, and before Appellant left the apartment, Security Forces Senior Airman (SrA) Jason Warren, a patrolman assigned to Security Forces, knocked on the front door of Appellant's apartment.  SrA Warren had been dispatched to Appellant's apartment to tell her to contact the first sergeant at work.  This was a common occurrence, as Appellant did not have a phone.

Appellant had the baby on her hip and the baby appeared to make eye contact with SrA Warren.  During the two minutes he was at the residence, SrA Warren did not hear any yelling and

7

nothing appeared to be out of the ordinary.  SrA Warren did not see Jackson.  SrA Warren delivered the message and departed.  Appellant left shortly thereafter, slamming the door.

After Jackson heard the door slam, he left the bathroom and found Destiny on the couch, lying on her side.  He tried to give her a bottle, but she was unresponsive and would not take it.  Jackson heard gargling noises coming from Destiny and other sounds.  He picked her up and observed vomit where she had been laying.  He held Destiny against his body and patted her on the back in an attempt to clear out any remaining emesis.  As he was holding her, she began to shake, her back arched, and her eyes rolled back in her head.  She then went limp.

Jackson immediately carried Destiny next door to the apartment of Mr. and Mrs. Harris to call 911 because there was no telephone in Appellant's apartment.  Only a few minutes elapsed between the time Appellant sped off and the time Jackson sought assistance from Mr. and Mrs. Harris.

Mr. and Mrs. Harris, Appellant's neighbors, both testified about what happened before Jackson arrived at their door.  Mr. Harris was seated in the computer room of their apartment, and Mrs. Harris was in their living room, which directly abutted Appellant's living room.  As the Harris' apartment shared a common but very thin wall with Appellant's apartment, they clearly heard the disturbance in Appellant's apartment.

Mr. and Mrs. Harris both heard Appellant, and only Appellant, yelling next door. Mrs. Harris heard Destiny crying loudly for about ten minutes during the middle of the yelling. Mrs. Harris also heard a loud bang against the shared living room wall, knocking off a picture in her apartment, and then she no longer heard Destiny crying. After the thump she heard Destiny emit one or two whimpers before going silent. Five minutes after she heard the loud bang against the wall, Mrs. Harris heard Appellant's front door slam so hard that it set off Mrs. Harris' door bell. She saw Appellant get into her car to leave, spinning her tires as she exited the parking lot. Appellant looked "very angry and very raged" as she left the apartment.

Mr. Harris also heard "thumps" and Appellant "yelling" in Appellant's apartment. Mr. Harris looked out the window and saw Appellant spin her tires as she exited the parking lot. According to both Mr. and Mrs. Harris, Jackson arrived at their door with Destiny asking them to dial 911 only a minute or two after Appellant left. Responding to Jackson's plea, Mrs. Harris called 911 and requested emergency assistance for Destiny.

Police and ambulance dispatch records, and the testimony of Jackson, SrA Warren, and Mr. and Mrs. Harris, establish the following sequence of events in a thirteen-minute period from 2:45 p.m. to 2:58 p.m.: SrA Warren was dispatched to

Appellant's apartment to deliver a message to her; SrA Warren arrived at Appellant's apartment and departed shortly thereafter; Appellant left the apartment; and, almost immediately thereafter, the Harrises called 911.

### C.  The Death of Destiny

Destiny was hospitalized as doctors attempted to save her. She had sustained serious blunt force trauma to her brain and the left side of her face and suffered significant hemorrhaging of the brain and eyes.  Notwithstanding two operations and extraordinary care, Destiny died five months later.

An autopsy confirmed significant injuries to Destiny's brain.  Dr. Gary D. Cumberland, a forensic pathologist and the chief medical examiner in the local Florida coroner's office, conducted an autopsy and found:  bruising on the surface of the brain, tearing of the brain tissue, swelling of the brain, and several subdural and subarachnoid hemorrhages.  The autopsy also revealed hemorrhages in the eyes.  The autopsy did not reveal injuries associated with external trauma (e.g., skin bruises) because the injuries occurred five months before Destiny died and had already healed.

Dr. Cumberland concluded that Destiny "died as a result of blunt force injuries to the head in the situation of the shaken baby syndrome."  A complete autopsy revealed no other possible cause of death.  In Dr. Cumberland's opinion, after speaking

with an eye specialist and a neuropathologist, the only possible cause of death was shaken baby syndrome.  Dr. Cumberland found the manner of death to be homicide, as the injuries were too severe to have happened accidentally.

### D.  AFOSI Investigation

Special Agent (SA) Liesl D. Davenport, an Air Force Office of Special Investigations (AFOSI) investigator, participated in four interviews with Appellant.  The first interview was conducted on the 28th of June by a Federal Bureau of Investigation (FBI) agent with SA Davenport sitting in.

Initially, Appellant was not a suspect because the investigators had been told that Appellant was not home at all that day.  Appellant told the investigators during the first interview that she went home at lunch because she had not been feeling well.  She told the investigators that she had taken some medication once she arrived at home, placed Destiny in her crib, and that she remained on the couch napping until SrA Warren came to her door.  Appellant stated that Jackson was either in the kitchen or bathroom the entire time; she did not recount any fight or argument.

During this first interview Appellant stated that she had never seen Jackson handle the baby improperly.  But she told the agents that she believed Jackson had accidentally shaken Destiny when she was unresponsive after he asked the Harrises to call

11

911.  Appellant said that Mrs. Harris told her that Jackson was shaking the baby so much that Mrs. Harris had to tell Jackson to put the baby down.

When the agents attempted to verify this point in an interview with Mrs. Harris, she denied that Jackson had shaken the baby or that she had told Appellant that version of the events.  Upon finding inconsistencies in Appellant's story, the agents began to view Appellant as a possible suspect.

SA Davenport conducted a second interview with Appellant with another AFOSI agent, SA Carver, on the 15th of August.  SA Davenport led the interview.  Because Appellant was a suspect at this point, SA Davenport advised Appellant of her Article 31(b), UCMJ, 10 U.S.C. §831 (b) (2000) rights, which she waived.

At this interview Appellant changed her story and stated that Destiny had not been in her crib.  Instead, Appellant stated that she held Destiny the entire time she was home. There was no mention of Appellant taking a nap on the couch in the second interview.  Appellant stated that she may have caused Destiny's injuries accidentally when she went to the door to speak with SrA Warren.  She thought she might have swung around quickly when she turned away from the door, causing Destiny's head to snap back.

At this point, the investigators knew that Jackson and Appellant had been arguing.  But when SA Davenport asked

12

Appellant about the argument she initially denied it.
Eventually, Appellant admitted that she and Jackson had argued
for twenty to thirty minutes during the time period in question.
However, Appellant remained adamant that she had not been angry
or frustrated when she left the apartment.  Appellant maintained
that Mrs. Harris had told her that Jackson had possibly
accidentally injured the baby.

A third interview was conducted two days later.  Appellant
was again read her Article 31(b), UCMJ, rights, which she
waived.  During this interview Appellant admitted that she might
have accidentally caused Destiny's injuries when she was playing
with her.  She described how she would regularly throw Destiny
in the air and catch her, and how she thought that perhaps this
caused the injuries.  She again stated that the accident also
might have happened when she was turning away from the door
after speaking with SrA Warren. Appellant told the investigators
that she tossed "it," meaning Destiny, in the air twice on that
day.

Upon further questioning, Appellant asserted that only
Appellant or Jackson could have injured Destiny.  When asked if
Jackson had injured Destiny, Appellant responded "no."
According to SA Davenport, there was no additional pertinent
information gleaned from the fourth interview.

### E.  Trial Testimony

In addition to introducing Appellant's statements to investigators, the prosecution introduced other statements made by Appellant to establish her consciousness of guilt.  Jackson testified that, after the injuries to Destiny, Appellant, while crying, told him that she might be responsible.  Appellant also told Jackson that they should not talk to AFOSI or the FBI and that she thought Jackson was on "their" side and not hers.

The prosecution introduced evidence to establish Appellant's possible motives to injure Destiny.  Stephanie Lewis, who was a friend of Appellant's sister, testified that Appellant had asked her, prior to Destiny's injury, if Lewis, who was separated from the father of her children, thought her "man" might come back if something happened to her children.

Appellant complained to Staff Sergeant (SSgt) Tynisha Quick, a coworker, that because of money she spent on diapers and formula for Destiny, Appellant did not have a phone, cable television, or a social life.  At one point, SSgt Quick observed Appellant speak directly to Destiny, blaming her for all the things she could no longer do.

SSgt Quick further testified that Appellant had told her that Destiny was more responsive to Jackson than to her. Appellant told SSgt Quick that Destiny would tremble and cry every time Appellant went near her, but would stop when Jackson

14

was near.  SSgt Quick testified that Appellant told her that she thought Jackson was trying to turn Destiny against her.

As will be discussed later when addressing Issue III, the prosecution presented several instances of Appellant's uncharged misconduct relating to Destiny.  Airman First Class (A1C) Crystal E. Mills testified to an earlier incident where she saw Appellant bite Destiny after the baby had bitten her.  Destiny began crying after Appellant bit her.  According to A1C Mills, Appellant ignored the cries.  A1C also recounted instances where Appellant would "flick" the hand of Destiny to get her to stop doing things.  SSgt Quick also recounted an incident where Appellant "thumped" or "flicked" Destiny on the thigh when she was misbehaving in a restaurant.[2]

Finally, the Government called two expert witnesses who established the cause of Destiny's death.  As previously discussed, Dr. Cumberland, a forensic pathologist from the coroner's office, explained his medical findings from the autopsy.  Dr. Sharon Cooper testified as an expert witness in the field of developmental and forensic pediatrics.  The defense did not object to her credentials, and Dr. Cooper was recognized by the court as an expert in her field.

Dr. Cooper stated that children under one year old were the

---

[2] Trial counsel agreed at a motion hearing to exclude evidence from Destiny's autopsy that revealed evidence of previous severe head trauma.

15

most likely victims of fatal child abuse.  She testified that there is a high degree of recidivism in child abuse, and specifically in shaken baby cases, meaning that an abuser will continue to shake a baby over a period of time.  Usually, the shaking becomes more intense in each instance.  Dr. Cooper also testified that the most common perpetrators of this type of abuse are parents.

Dr. Cooper then explained the specific medical findings consistent with shaken baby syndrome.  She stated that retinal hemorrhaging, brain injury, and bone trauma are the three most common symptoms.  After going through the symptoms, Dr. Cooper explained the common triggers that would cause a person to shake a baby.  According to Dr. Cooper, the most common cause is persistent crying.  She stated that a person would have to shake a baby for about twenty seconds to inflict serious damage.

Dr. Cooper testified that she reviewed the medical, investigative and social work records associated with this case. She also interviewed Destiny's primary care physician and her foster mother.  She observed all of the witnesses called during the trial as well.  After going over all of the evidence, Dr. Cooper opined that Destiny died of an inflicted injury, specifically, of shaken baby syndrome combined with blunt force trauma.  She specifically noted that Destiny's patient records from her initial treatment stated that Destiny exhibited

swelling of the scalp and bruising on the side of the face. This bruising and swelling was consistent with external blunt force trauma, such as a baby would experience after being thrown against a wall.

Dr. Cooper also explained the standard progression of symptoms in a shaken baby case. It usually takes fifteen minutes after the shaking has occurred for any symptoms to appear. The symptoms manifest themselves in a change in mental status or an abnormal cry. The abnormal cry stems from an altered neural state, which causes breathing difficulty. Jackson described this type of noise during his testimony.

The victim then becomes less responsive and less active. Next, a victim will vomit. The vomit will not be normal, because the child has lost neural functioning to the point where the stomach is no longer digesting food. Finally, the baby will arch her back, roll her eyes back in her head, and become stiff. This is a classic tonic seizure, associated with abnormal electrical activity in the brain. Dr. Cooper stated that a baby's eyes could be open after the trauma, but they would not be able to track anything visually. All of Destiny's symptoms, as recounted by Jackson, were consistent with shaken baby syndrome.

Dr. Cooper testified that it was unlikely that anything else caused Destiny's symptoms. She also stated that the act of

patting the child on the back to try to dislodge vomit would not
cause the symptoms Destiny experienced.  Running with an infant
in a person's arms or tossing a baby in the air and catching her
would not cause this type of injury either.

The Government rested at the conclusion of Dr. Cooper's
testimony.  After the presentation of the prosecution's case,
Appellant rested.  In closing, the prosecution argued that the
evidence rebutted Appellant's prior claim of an accidental
injury to Destiny and identified Appellant as the perpetrator of
the murder of Destiny.  Appellant's argument revolved around a
single point -- that the members could not "exclude Mr. Jackson
as a potential perpetrator of the offense."  After three hours
of deliberations, the panel returned a verdict finding Appellant
guilty of the unpremeditated murder of Destiny.

## III.  DISCUSSION

### A.  Appellant's Opportunity to Impeach Jackson

#### 1.

Appellant alleges the military judge erred under Military
Rule of Evidence (M.R.E.) 613 when he denied the defense request
to recall SA Davenport to establish alleged inconsistencies
between Jackson's testimony at trial and a statement he made to
SA Davenport during the investigation.  The purported
inconsistency related to Destiny's circumstances when Appellant

left her apartment.  At trial Jackson testified that Destiny was limp and non-responsive when Appellant left.  Defense counsel asserted that Jackson's August 15 statement to SA Davenport stated that Destiny was crying after Appellant left.

During cross-examination, defense counsel referenced Jackson's prior statements to investigators and the investigators' notes to establish that Jackson had changed certain aspects of his story between statements, embellished his trial testimony by including details that he had omitted from his prior statements, and presented trial testimony that was different in some respects from his prior statements.  For example, the defense had Jackson admit that he initially lied to the FBI about whether he and Appellant were in a fight, and that a prior statement made no reference to Appellant spitting on him or Appellant speeding away from the apartment.

With respect to other questions about the substance of the five prior statements Jackson made during the course of the investigations, defense counsel attempted to refresh Jackson's recollection as to what he had said in these prior statements. Jackson repeatedly responded that he either did not remember a fact or did not remember what he had said in his statements. While the trial counsel stated that the prosecution would not object if the defense wanted to admit Jackson's August 15th statement to investigators, defense counsel declined the

invitation.

After the Government concluded its case, defense counsel sought to recall SA Davenport pursuant to M.R.E. 613(b) in order to prove inconsistencies in Jackson's testimony with extrinsic evidence. Specifically, defense counsel explained to the military judge during an Article 39(a), UCMJ, 10 U.S.C. § 839 (a) (2000), session that he expected SA Davenport to testify that Jackson told her during the investigation that Destiny was crying after Appellant left the house. The defense counsel argued that the testimony of SA Davenport was extrinsic evidence that contradicted testimony Jackson gave at trial.

The military judge did not allow defense counsel to call SA Davenport. The military judge ruled that the statements were not inconsistent because Jackson had simply stated that he did not remember when he was asked about whether Destiny was crying. The military judge opined that there is only an inconsistent statement when the witness denies making the statement, and Jackson had merely stated that he did not remember and did not have any recollection of Destiny crying after Appellant left.

In his ruling, the military judge cited M.R.E. 608 rather than the appropriate rule of evidence, M.R.E. 613. While the military judge referred to M.R.E. 608, the explanation of the ruling focused on whether the evidence could be admitted as a prior inconsistent statement. Although the record is less than

clear, the military judge appears to have determined that the evidence could not be brought in under M.R.E. 613. Moreover, the military judge instructed the members on prior inconsistent statements with regard to Jackson's testimony during final instructions on the merits.

Defense counsel and counsel for the Government agreed that the extrinsic evidence was for impeachment, rather than for substantive purposes. We note that defense counsel attached SA Davenport's AFOSI notes from the August interview with Jackson as an appellate exhibit and offer of proof and expressly chose not to attach Jackson's statements as appellate exhibits. The notes support Appellant's assertion that Jackson told the agent that Destiny was crying after Appellant left the apartment.

2.

The process of impeachment by prior inconsistent statement is a tool to attack the credibility and/or recollection of a witness. "By showing self-contradiction, the witness can be discredited as a person capable of error." United States v. Banker, 15 M.J. 207, 210 (C.M.A. 1983); 3A John H. Wigmore, Evidence § 874 (Chadbourne rev. 1970). M.R.E. 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to explain or deny the same . . . ."

21

If the inconsistency is admitted, extrinsic evidence is generally not admissible.  United States v. Gibson, 39 M.J. 319, 324 (C.M.A. 1994) (holding that "'the more expedient practice' is to disallow extrinsic evidence of a prior inconsistent statement if the witness admits making the statement")(citations omitted).  If the inconsistency is not admitted, or the witness equivocates, extrinsic evidence may be admitted, but only for impeachment.  United States v. Damatta-Olivera, 37 M.J. 474, 478 (C.M.A. 1993) ("whether testimony is inconsistent with a prior statement is not limited to diametrically opposed answers but may be found as well in evasive answers, inability to recall, silence, or changes of position").

A decision to admit or exclude evidence is reviewed for an abuse of discretion.  Id.  In this case, the military judge erred when he apparently determined that a failure to remember facts contained in a prior statement cannot be inconsistent with in-court testimony that differs from those facts.[3]  This Court,

---

[3] In contrast, the military judge did not err with respect to defense counsel's effort to impeach Jackson regarding Appellant's interaction at the apartment with Destiny on June 23.  Defense counsel asserted that Jackson's prior statement to AFOSI stated that Appellant was lying on the couch playing with Destiny.  The military judge found that Jackson was not asked about this during his testimony, that there was no inconsistency, and that the defense had not established a foundation for later impeachment.  The record supports the military judge's findings, and this is a correct statement of the law.  See United States v. Hale, 422 U.S. 171, 176 (1975) (citation omitted) (reasoning that "[a]s a preliminary matter .

in Damatta-Olivera, 37 M.J. at 478 and United States v.

Meghdadi, 60 M.J. 438, 444 (C.A.A.F. 2005), has noted that an

inconsistency, for purposes of M.R.E. 613, may be found "not

only in diametrically opposed answers," but also in "inability

to recall," Damatta-Olivera, 37 M.J. at 478, or equivocation.

Meghdadi, 60 M.J. at 444.

A military judge has considerable discretion to determine

if the trial testimony is inconsistent with a prior statement.

Damatta-Olivera, 37 M.J. at 478; see also United States v.

Insana, 423 F.2d 1165, 1170 (2d Cir. 1970).  But here the

military judge appears not to have understood that an inability

to recall or a "non-responsive" answer may present an

inconsistency for purposes of M.R.E. 613.  Consequently, his

evidentiary ruling, based on an incorrect understanding of the

law, was an abuse of discretion.  United States v. Roberts, 59

M.J. 323, 326 (C.A.A.F. 2004) ("A military judge abuses his

. . . the court must be persuaded that the [prior] statements are indeed inconsistent [with trial testimony].").  The military judge did not abuse his discretion in rejecting the defense attempt, under the guise of impeachment, to bring in "new evidence" that related to a point that Jackson had not testified to at trial.  See Damatta-Olivera, 37 M.J. at 478 (stating that "[t]he military judge has considerable discretion to determine if trial testimony is inconsistent.").

Similarly, we see no basis for Appellant's assertion of error with respect to an alleged third inconsistency regarding whether Appellant threw anything at Jackson during their argument.  Defense counsel did not raise an inconsistency between Jackson's testimony and a prior statement with respect to this matter at trial.

discretion when . . . he is incorrect about the applicable law, or when he improperly applies the law.").

Applying nonconstitutional harmless error analysis, we conduct a de novo review to determine whether this error had a substantial influence on the members' verdict in the context of the entire case. See Kotteakos v. United States, 328 U.S. 750, 764-65 (1946); United States v. Berry, 61 M.J. 91, 97 (C.A.A.F. 2005). We consider four factors: (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question. Berry, 61 M.J. at 98. When a "fact was already obvious from . . . testimony at trial" and the evidence in question "would not have provided any new ammunition," an error is likely to be harmless. United States v. Cano, 61 M.J. 74, 77-78 (C.A.A.F. 2005); see also United States v. Santos, 59 M.J. 317, 322 (C.A.A.F. 2004).

As outlined above, and as articulated by the lower court, the Government presented a convincing case against Appellant. The evidence shows that Appellant was in a rage, that she was alone with the victim, that she admitted to investigators that only she and Jackson were possible suspects, that she did not believe Jackson injured the baby, that she was untruthful on numerous occasions, and that the timeline and quality of the injuries amply supported the Government's version of the facts.

24

We also note that Dr. Cooper's medical testimony regarding the standard progression of shaken baby syndrome was both unrebutted and consistent with the description of Destiny's symptoms. Further, the timeline established by the Government's witnesses, alone or in combination with Appellant's pretrial statements regarding Jackson's location when she left the apartment, make Jackson an unlikely suspect.

The defense's case consisted of cross-examination of the Government's witnesses in an attempt to show that it was possible that Jackson, rather than Appellant, could have committed the crime. The defense's case was exceptionally weak in light of Appellant's statements that Jackson was in the bathroom when she left and that she did not believe he injured Destiny, as well as the evidence of Appellant's admissions, consciousness of guilt, and her rage at the time of Destiny's injuries. Finally, there was no credible refutation of the Government timeline, which was persuasive evidence that Destiny's injuries were sustained while Jackson was locked in the bathroom, given the few minutes that passed between when Appellant left the apartment and when the 911 call was placed.

The materiality of the excluded extrinsic evidence of prior inconsistent statements must be viewed with an eye to its permissible purpose, which was for impeachment only. The defense never sought to seek the admission of any of Jackson's

25

statements, which presumably contained the same inconsistency noted in the investigator's notes, for use as substantive evidence under M.R.E. 801(d)(1)(A) or any other evidentiary rule.

As the lower court articulated and the record reveals, defense counsel effectively impeached Jackson with respect to the prior inconsistent statements by intrinsic evidence. Harrow, 62 M.J. at 656-57.  While defense counsel did not move to admit Jackson's August 15 statement, he repeatedly referred to it and Jackson's other statements to investigators in his cross-examination of Jackson.  Defense counsel cross-examined Jackson at length regarding his lie to the FBI, changes in his story between statements, his inability to remember even after having the opportunity to review his prior statements, his embellishment of his trial testimony beyond what he relayed to investigators, and the fact that his memory must have been better when the statements were given.  And we agree with the lower court that "defense counsel used this impeachment extensively and effectively in his closing argument."  Id. at 657.

Furthermore, the military judge gave an instruction regarding inconsistent statements, reiterating the point that Jackson's credibility was at issue.  Members are presumed to follow the military judge's instructions, United States v.

26

Taylor, 53 M.J. 195, 198 (C.A.A.F. 2000), and we have no basis for concluding that they did not in this case.

The combination of cross-examination and argument by the defense counsel impeached Jackson's credibility and ability to recall. The addition of the AFOSI agent's testimony would have been cumulative, and would not have changed the arguments proffered by defense counsel to the members. Nor would it have had a substantial influence on the members' verdict. See Santos, 59 M.J. at 322 (reasoning cumulative evidence was of little probative value); see also United States v. Mitchell, 113 F.3d 1528, 1532 (10th Cir. 1997) (finding failure to admit extrinsic evidence of witness's prior inconsistent statement harmless where defense counsel asked her whether she had made the statement; although she testified she did not remember making the statement, the jury was aware of the attack on her credibility). Under the facts of this case, we cannot say that a thorough impeachment of Jackson's credibility and recollection was not completed even absent the extrinsic evidence.

In light of all of the above factors, and given the purpose for which M.R.E. 613 evidence may by used, the error was harmless in this case.

### B. M.R.E. 404(b) Evidence

#### 1.

Defense counsel moved in limine for several pieces of

evidence proffered by trial counsel to be excluded. The

evidence at issue was:

1) SSgt Quick's testimony that Appellant thumped the baby hard enough to make the baby scream.
2) A1C Mills' testimony that Appellant flicked Destiny on the body to punish her if Destiny reached for something.
3) Nina Harris' testimony that she observed Appellant call Destiny stupid and ugly, pull at Destiny by jerking her arm, and grab her by the cheeks and pinched them hard when she disobeyed.
4) Sharon Rogers' and Deborah Gardner's testimony that they witnessed Appellant brushing the baby's hair vigorously and without care, and Mrs. Gardner's testimony that she did so for six hours straight after the baby's brain surgery. This occurred at the hospital after Destiny had been shaken.
5) Nina Harris' testimony that on one occasion Appellant left Destiny at the Harris' without food or diapers, then turned off her cell phone and did not return that night.

The military judge ruled that the first three pieces of

testimony were admissible, but the last two were not.

In his ruling, the military judge determined that under

M.R.E. 404(b) the first three pieces of evidence tended to prove

a pattern of abuse, as well as intent. When the members were

properly instructed on the use of the M.R.E. 404(b) evidence,

however, they were instructed that it could only be used to show

Appellant's intent or absence of accident. Appellant contends

that none of this evidence should have been admitted and that it

prejudiced her.

28

2.

A decision to admit evidence is reviewed for abuse of discretion. United States v. McCollum, 58 M.J. 323, 335 (C.A.A.F. 2003). In this case, the military judge applied the correct test for the admissibility of uncharged misconduct under M.R.E. 404(b). United States v. Reynolds, 29 M.J. 105, 109 (C.M.A. 1989). This Court recently summarized the analysis under Reynolds: First, does the evidence reasonably support a finding by the court members that Appellant committed prior crimes, wrongs or acts? Second, what "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence? And last, is the "probative value . . . substantially outweighed by the danger of unfair prejudice?" United States v. Barnett, 63 M.J. 388, 394 (C.A.A.F. 2006) (citations omitted).

The uncontroverted testimony describing each incident of uncharged misconduct reasonably supports a finding by the court members that Appellant did commit each of these alleged prior acts.

We next address whether any of this evidence makes a fact of consequence more or less probable. We begin by noting that murder is a specific intent crime. This offense permits conviction of lesser included offenses stemming from Destiny's death in the absence of specific intent to kill -- including but

not limited to involuntary manslaughter, assault consummated by a battery and negligent homicide.  Manual for Courts-Martial, United States pt. IV, para. 45.d. (2005 ed.) (MCM).  While the defense did not argue accident, evidence produced at trial, through Appellant's statements to investigators, supported an argument that the injuries might have been accidentally inflicted.  The prosecution was entitled to present evidence to rebut such an argument.

3.

Appellant argues that intent evidence is never admissible unless a defendant specifically defends on the ground of either lack of the requisite intent or accident.  The Supreme Court, examining this same question, unequivocally determined that evidence of intent and lack of accident may be admitted regardless of whether a defendant argues lack of intent because every element of a crime must be proven by the prosecution. Estelle v. McGuire, 502 U.S. 62, 69 (1991) (citing Mathews v. United States, 485 U.S. 58, 64-65 (1988)).

This Court has dealt inconclusively with the holding of Estelle in prior cases on the ground that Estelle involved a state rule of evidence.  Compare United States v. Diaz, 59 M.J. 79, 95 n.3 (C.A.A.F. 2003) (distinguishing Estelle), and United States v. Morrison, 52 M.J. 117, 122-23 (C.A.A.F. 1999) (not citing, but implicitly rejecting Estelle), with United States v.

30

Whitner, 51 M.J. 457, 461 (C.A.A.F. 1999), and United States v. Sweeney, 48 M.J. 117, 120 (C.A.A.F. 1998) (embracing the notion that the prosecution must prove every element).

This Court's intermittent efforts to distinguish Estelle as a Supreme Court case addressing state, rather than federal, law does not detract from the force of the basic tenet asserted by the Supreme Court:  "A simple plea of not guilty . . . puts the prosecution to its proof as to all elements of the crime charged . . . ."  Mathews, 485 U.S. at 64-65 (1988) (reviewing a federal bribery conviction); see also Old Chief v. United States, 519 U.S. 172, 199 (1997) (reviewing a federal firearm possession conviction).

4.

But the question remains whether the relatively minor acts admitted in this case under M.R.E. 404(b) in fact make intent to kill or absence of accident more likely than not, and, if not, whether Appellant was prejudiced by their admission.

We agree that the relevance of these minor acts to the intent to kill is tenuous, at best.  But we need not resolve the issue of error where, as here, the question of prejudice is easily decided.  United States v. Hall, 56 M.J. 432, 437 (C.A.A.F. 2002); United States v. Nickoson, 15 C.M.A. 340, 344, 35 C.M.R. 312, 316 (1965).

We conclude that the admission of the acts under M.R.E.

31

404(b) did not prejudice Appellant.  The Government adduced evidence at trial that Appellant shook Destiny with great force for at least twenty seconds and either threw her against a wall or used other force sufficient to result in serious blunt force trauma to Destiny's brain and the left side of her face, including significant hemorrhaging of the brain and eyes and, ultimately, death.  In the context of the entire case, we are convinced that acts of "flicking," "pinching," or "thumping" are minor acts that did not have a substantial influence on the members' verdict in this case.  Indeed, in his argument on findings, the trial counsel did not even mention any of the uncharged misconduct.

For the reasons stated above -- the weight of the remaining evidence, combined with the weakness of the defense's case -- we conclude that any error stemming from the admission of this evidence did not substantially prejudice Appellant.  See Barnett, 63 M.J. at 397 (holding that when the government presents a strong case, the defense presents a weak case, and the erroneously admitted M.R.E. 404(b) evidence was "of marginal importance given the difference in contexts" between the specifications and the incidents recounted in the erroneously admitted evidence, the error was harmless); United States v. Baumann, 54 M.J. 100, 105 (C.A.A.F. 2000) (reasoning that when the "prosecution presented an overwhelming case," the

appellant's defense was "extremely weak," and the military judge properly instructed on the use of M.R.E. 404(b) evidence, the error was harmless); United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999) (holding that when the remainder of the Government's case was strong and the defense presented no evidence to contradict it, instead relying "on suggestion and insinuation," the M.R.E. 404(b) error was harmless); United States v. Corbett, 29 M.J. 253, 256 (C.M.A. 1989) (determining that inadmissible M.R.E. 404(b) evidence had a minimal effect on the members, considering all the other evidence presented at trial, the weakness of appellant's own testimony on the merits, and the inadmissible evidence's tenuous relevance); see also United States v. Davis, 657 F.2d 637, 640 (4th Cir. 1981) (holding that erroneous admission of M.R.E. 404(b) evidence was harmless when the remaining evidence conclusively implicated the appellant); United States v. Ezzell, 644 F.2d 1304, 1306 (9th Cir. 1981) (holding that where evidence of guilt is overwhelming, M.R.E. 404(b) error was harmless).

### C.  Profile Evidence

Dr. Cooper testified as an expert witness in the fields of developmental and forensic psychiatry.  She testified about child abuse and shaken baby syndrome in general and her specific findings in this case.  The defense did not challenge her methodology or the relevance or reliability of her testimony.

The defense counsel did raise the issue of impermissible profile evidence and reiterated their understanding that the Government did not intend to offer such evidence.  The Government agreed.

Appellant challenges the following particulars of Dr. Cooper's testimony as impermissible profile evidence.  First, that the most common person to fatally abuse a child is a biological parent.  Defense counsel objected to this testimony, but it was allowed by the military judge.  Second, that the most common trigger for baby shakings is persistent crying, which the defense did not object to at trial.  Finally, Dr. Cooper's testimony about the symptoms and progression of shaken baby syndrome and her medical conclusion that Destiny's primary diagnosis was probably most consistent with an inflicted injury, as opposed to an accidental injury.  Defense counsel objected, and the military judge overruled the objection.

Dr. Cooper did not offer an opinion as to which parent abused the child in this case.  Appellant argues that all of the testimony above constituted impermissible profile evidence that placed Appellant in the profiled category and excluded Destiny's father from the profiled category.

Profile evidence is evidence that presents a characteristic profile or trait of an offender, and then places the accused's personal characteristic or trait within that profile as proof of guilt.  United States v. Rynning, 47 M.J. 420, 422 (C.A.A.F.

34

1998).  In United States v. Banks, this Court held that

"generally, use of any characteristic 'profile' as evidence of

guilt or innocence in criminal trials is improper."  36 M.J.

150, 161 (C.M.A. 1992).  Such evidence is improper because it

treads too closely to character evidence offered to show that an

accused acted in conformity with that character and committed

the act in question, evidence prohibited under M.R.E. 404(b).

See Banks, 36 M.J. at 161.

    This Court recognizes that characteristic evidence of the

abuser is distinguishable from evidence that focuses on the

characteristics of a battered child.  United States v. Traum, 60

M.J. 226, 235 (C.A.A.F. 2004).  Moreover, evidence of the

characteristics of a child abuser is further distinguishable

from evidence about the symptoms and progression of shaken baby

syndrome.  This is true even if that medical testimony, tied to

other facts adduced at trial, makes it more likely that an

accused is the one guilty of the charged offense.

    We agree with Appellant that two of Dr. Cooper's statements

were inadmissible profile evidence.  The statements that the

most common person to fatally abuse a child is a biological

parent, and the statement that the most common trigger for baby

shakings is persistent crying, are focused on characteristics of

the abuser, as opposed to characteristics of the child.  Id. at

234-35.  But the other evidence complained of -- symptoms and

progression of shaken baby syndrome -- is not profile evidence.

Of course, Dr. Cooper's statements relating to profile evidence pertained equally to both parents -- Appellant and Jackson were both Destiny's biological parents, and Destiny's persistent crying was heard by both of them on the day she sustained her fatal injuries.

None of the profile evidence placed Appellant in the profiled category and exclude Destiny's father from the profiled category. Rather, it placed them both squarely within the profiled category. Given that the case focused on which parent was responsible for the injury, and that the profile evidence applied equally to each of them, we fail to see the prejudice. Consequently, any error in admitting this evidence was harmless.[4]

Appellant does not argue that evidence regarding the progression and symptoms of shaken baby syndrome are either inadmissible expert testimony or profile evidence per se. Rather, the argument is that such testimony, described as a "modified profile of Destiny's child abuse," constituted impermissible profile evidence in this case because the

---

[4] As the defense did not object at trial when Dr. Cooper testified that the most common trigger for baby shakings is persistent crying, we normally would review such errors under a plain error analysis. United States v. Powell, 49 M.J. 460 (C.A.A.F. 1998). We need not undertake a separate plain error analysis in this case, as the issue can be resolved, along with the evidence Appellant did object to, by determining whether any error unduly prejudiced Appellant.

testimony lined up with other facts adduced at trial in a manner that allowed the Government to argue that it was Appellant, rather than Jackson, who committed the offense of unpremeditated murder.  We reject Appellant's argument.

First, the evidence regarding the progressions and symptoms of shaken baby syndrome focuses on the characteristics of the child, and fits squarely within Traum.  Second, we are aware of no authority that suggests that otherwise admissible expert testimony regarding the symptoms and progression of a medical syndrome can be transformed into profile evidence because the timing of the symptoms supports an argument that it was the accused that committed the offense.

Evidence is not profile evidence simply because it tends to incriminate an accused.  The prohibition against profile evidence does not prohibit otherwise admissible expert evidence, simply because other facts tie the testimony to a conclusion that an appellant was the one in the best position to have committed the charged act.

### D.  Improvident Guilty Plea

Appellant contends her guilty plea to the larceny charge stemming from her fraudulent insurance claim was improvident. During the providency inquiry Appellant admitted that she fraudulently made a claim to her insurance carrier so that the carrier would pay for damage done to another airman's car.

United States v. Harrow, 06-0474/AF

Appellant was not driving the car covered by her insurance carrier when she collided with the other airman's vehicle. In fact, the accident occurred before Appellant had the insurance upon which she made the claim. Appellant did not tell the insurance company either of these facts and intended that they pay the claim. As a result of Appellant's misrepresentations, the insurance carrier paid the other airman for damage Appellant did to his car in the accident.

This Court rejects a guilty plea only where the record shows a substantial basis in law and fact for questioning a plea. United States v. Roderick, 62 M.J. 425, 428 (C.A.A.F. 2006). We review a military judge's decision to accept a guilty plea for an abuse of discretion. United States v. Phillippe, 63 M.J. 307, 309 (C.A.A.F. 2006). This Court permits the military judge "in a borderline case . . . [to] give weight to the defense evaluation of the evidence." United States v. McCrimmon, 60 M.J. 145, 152 (C.A.A.F. 2004) (citing United States v. Clark, 28 M.J. 401, 407 (C.M.A. 1989)).

Appellant does not question that the military judge properly stated the elements of the offense of a wrongful-obtaining larceny. Nor does Appellant contend that Superior Insurance Company had any obligation to pay a claim on an uncovered car for an accident that took place outside of the coverage period. Appellant nonetheless questions the factual

sufficiency of the providency inquiry.

A guilty plea is provident if the facts elicited make out each element of the charged offense. See United States v. Garcia, 44 M.J. 496, 498 (C.A.A.F. 1996) (concluding that the providence inquiry adequately established a factual basis supporting each of those elements); United States v. Davenport, 9 M.J. 364, 367 (C.M.A. 1980) (holding that a plea of guilty is provident where the factual circumstances as revealed by the accused himself objectively support the alleged elements of the offense).

In this case, the providence inquiry established that insurance money in the amount of $729.65 was "wrongfully obtained" from Superior Insurance for the use of Airman (Amn) Hill, with the intent to defraud Superior Insurance of the use and benefit of the money. See United States v. Riddle, 44 M.J. 282, 287 (C.A.A.F. 1996) (establishing larceny for intent to steal pay entitlements to which appellant did not believe he was entitled). Appellant had no entitlement to insurance for an accident prior to her coverage period, as she acknowledged. As the providence inquiry shows, Appellant designated Amn Hill to be the recipient of the Superior Insurance payment. Appellant stated that she intended Superior Insurance to pay the money and that she "learned that Superior Insurance paid" Amn Hill.

A similar scenario is described in the MCM explanation of

39

the offense of an obtaining type larceny:  if a person "obtained the delivery of another's goods to a person or place designated by the accused," the accused is guilty of larceny if the other elements of the offense are proven.  MCM pt. IV, para. 46.c.(1)(b).  We reject Appellant's suggestion that the military judge's failure to elicit how Appellant "knew it was her representation that deceived the insurance company," or "why her misrepresentation was an important factor in the insurance company's decision to pay," or "when the $729.65 was paid by the insurance company to Airman Hill," alone or together, create any basis, let alone a substantial basis, in law or fact for questioning the sufficiency of the plea to this offense.  See United States v. Faircloth, 45 M.J. 172, 174 (C.A.A.F. 1996) (declining to speculate post-trial on factual matters that might have been contested at trial in the context of examining whether a guilty plea was provident).

We similarly reject Appellant's argument that the motive for committing this offense -- that Appellant knew she was supposed to pay Amn Hill for the damage to her car -- sets up a matter inconsistent with her plea.  See, e.g., MCM pt. IV, para. 46.f.(iii)(A) (recognizing that the relevant inquiry is whether the accused had the requisite intent).  Appellant's suggestion that her motive in wrongfully obtaining the insurance money somehow places the facts of this case within the framework of a

"debt or the amount thereof is not the proper subject of a larceny," United States v. Mervine, 26 M.J. 482, 483-84 (C.M.A. 1988), is without merit.

### E.    Unauthorized Reduction in Pay Grade

At trial, Appellant pled guilty to being absent without leave for four days.  The Court of Criminal Appeals held that her plea on this charge was improvident.  Harrow, 62 M.J. at 662.  After determining the plea was improvident the Court of Criminal Appeals reassessed Appellant's sentence to a dishonorable discharge, twenty-four years and six months of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1.  Because no reduction to E-1 was adjudged at trial, Appellant argues that this was an unlawful increase in her sentence.

We review a sentence reassessment by a Court of Criminal Appeals for obvious miscarriages of justice or abuses of discretion.  United States v. Buber, 62 M.J. 476, 478 (C.A.A.F. 2006).  The Government concedes that it was error to reassess the sentence to include a reduction to E-1 when such reduction was not adjudged at trial.  At trial, Appellant was already an E-1.

This abuse of discretion appears, however, to be an error without any practical import, let alone, any prejudice.  And Appellant identifies none.  This is not surprising.  No logic

41

suggests that the Court of Criminal Appeals would have <u>decreased</u> some other portion of the sentence assessment if it understood that another portion of the sentence, the reduction in rank, was not available to it.

Thus, while we agree that the lower court abused its discretion in assessing a reduction to E-1 that was not adjudged at trial, where Appellant was already an E-1, it is an increase in punishment only in the most technical of senses, since the reduction was void ab initio, and a nullity. We decline to remand the case for a sentence reassessment under these particular facts, for correction of an error that has not had, and never could have, any negative effect upon Appellant. Rather, we set aside that portion of the Court of Criminal Appeals decision purporting to affirm reduction to E-1.

### F. Post-trial and Appellate Delay

The final issue is whether Appellant was deprived of her right to due process by the 1,467 days that elapsed between her trial and completion of appellate review. Of that delay, 826 days was time between when the final briefs were submitted to the Court of Criminal Appeals and the issuance of its decision. Appellant contends she was prejudiced because, due to the appellate delay, her lead appellate counsel was unable to argue her case.

United States v. Harrow, 06-0474/AF

In this case, the overall delay of 1,467 days between the trial and completion of review at the Court of Criminal Appeals is facially unreasonable.  Because we conclude that the delay is facially unreasonable, we examine the four factors set forth in Barker v. Wingo, 407 U.S. 514, 530 (1972):  (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice.  United States v. Moreno, 63 M.J. 129, 135-36 (C.A.A.F. 2006).  We need not engage in a separate analysis of each factor where we can assume error and proceed directly to the conclusion that any error was harmless beyond a reasonable doubt.  See United States v. Allison, 63 M.J. 365, 370 (C.A.A.F. 2006).  This approach is appropriate in Appellant's case.

Having considered the totality of the circumstances and entire record, we conclude that any denial of Appellant's right to speedy post-trial review and appeal was harmless beyond a reasonable doubt and that no relief is warranted.

## IV.  CONCLUSION

In evaluating Appellant's assignments of error we have considered not only the impact of each individual error, but also any cumulative prejudice that could have arisen from a combination or errors.  See Banks, 36 M.J. at 170-71.  We conclude that neither individually nor in combination was Appellant prejudiced by the errors in this case.  The decision

43

of the United States Air Force Court of Criminal Appeals, except for that portion purporting to affirm a reduction to E-1, is affirmed.

EFFRON, Chief Judge (concurring in part and in the result):

I concur in the majority opinion, subject to the following with respect to Issues I and III:  While I have reservations both as to the adequacy of the opportunity to impeach Antonio Jackson and as to the admissibility of Appellant's prior acts of misconduct, I agree with the majority that any errors in regard to those matters were harmless in view of Appellant's pretrial statements and the other evidence in the case.