# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39760**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Armis J. SUNDAY**
Cadet, U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 3 March 2021[1]

————————————

*Military Judge:* Jefferson B. Brown.

*Approved sentence:* Dismissal, confinement for 75 days, and forfeiture of all pay and allowances. Sentence adjudged 1 February 2018 by GCM convened at United States Air Force Academy, Colorado.

*For Appellant:* Zachary Spilman, Esquire (argued); Major Amanda E. Dermady, USAF; Major Yolanda D. Miller, USAF.

*For Appellee:* Major Jessica L. Delaney, USAF (argued); Lieutenant Colonel Matthew J. Neil, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Chief Judge J. JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

[1] We heard oral argument in this case on 18 August 2020.

J. JOHNSON, Chief Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] The court-martial sentenced Appellant to a dismissal, to confinement for 75 days, and to forfeiture of all pay and allowances. The convening authority approved the adjudged sentence.

Appellant raises nine issues on appeal: (1) whether the military judge erred in denying the Defense's motion to suppress Appellant's statements to agents of the Air Force Office of Special Investigations (AFOSI); (2) whether Appellant received ineffective assistance of counsel;[3] (3) whether the military judge provided erroneous findings instructions to the court members; (4) whether the military judge erroneously impeded trial defense counsel's cross-examination of the alleged victim; (5) whether trial counsel's closing argument constituted prosecutorial misconduct; (6) whether it was plain error for the military judge to allow the alleged victim to comment on her own hearsay statements; (7) whether the Government may amend a record of trial after authentication and over defense objection without a certificate of correction; (8) whether the evidence is legally and factually sufficient to disprove consent and reasonable mistake of fact as to consent; and (9) whether the mandatory dismissal is an inappropriately severe punishment under the unique circumstances of this case. In addition, we also consider two matters not raised by Appellant: whether he is entitled to relief for facially unreasonable post-trial delay, and whether the convening authority's failure to state his reasons for denying Appellant's request to defer his forfeitures warrants relief. We have carefully considered issue (9) and find that it does not warrant further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). With regard to the remaining issues, we find no error that has materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

# I. BACKGROUND

SW met Appellant in the fall of 2016 during the first semester of their first year as cadets at the United States Air Force Academy (USAFA), when they had a class together. They became friends, but had no romantic or sexual relationship. They would see each other during the school day, but they rarely

---

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] We heard oral argument on issues (1) and (2).

spent time together away from class. Nevertheless, they communicated frequently and each considered the other a close friend. SW and Appellant did not have a class together in the spring semester, but their friendship continued.

On the night of Friday, 14 April 2017, SW was in her dormitory room drinking alcohol and watching a documentary on her computer. SW's roommate was away from the dormitory that night, and SW was alone. SW received text messages from Appellant, who was at an off-campus party in Colorado Springs, Colorado. They made small talk, and eventually they agreed Appellant would bring alcohol to SW's room and they would "hang out." Neither Appellant nor SW suggested any expectation of sexual activity.

## A. SW's Account of the Sexual Assault

According to SW's testimony at trial, Appellant arrived as planned shortly after midnight, and he and SW drank alcohol and talked together about topics such as their classes, their friends, and the documentary SW was watching. At one point, Appellant asked if he could touch SW's earlobe, which she allowed although she thought it was "weird." Appellant told SW he could not go back to his own dorm room because his roommate was there watching a movie with a "girl." The conversation lasted approximately 30 to 45 minutes. SW began "dozing off" two or three times, because she was tired and "pretty drunk" to the point that she was "probably slurring [her] words." When she fell asleep, Appellant would shake her shoulder and tell her to wake up.

Eventually, Appellant told SW he would text his roommate to see if he could go back to his dorm room so SW could sleep. Appellant picked up his backpack, turned off the lights, and moved to the door, where he appeared to text his roommate.[4] Appellant then told SW he could not go back to his room yet, and asked if he could wait in her room while she slept. SW told him he could. SW fell asleep in her bed under the covers.

According to SW's testimony, she awoke sometime later lying on her side with her shirt pulled up and her sweatpants pulled down to her mid-thighs. Appellant was lying on the bed just behind her; he was reaching into her underwear and had inserted two fingers in her vagina. After SW awoke, Appellant began to whisper "[S], are you awake?" SW lay still with her eyes closed as Appellant continued to penetrate her vagina with his fingers for some period of time. Eventually, Appellant pulled his arm back, replaced her shirt, pulled her sweatpants up, pulled the bed covers over her, and departed.

## B. Appellant's Account of the Sexual Assault

---

[4] In reality, as Appellant later admitted, the story about his roommate having a girl in their room had been a lie.

Appellant provided a somewhat different version of events when he testified at trial. Appellant agreed with SW that up until 14 April 2017, they had a non-sexual friendship, and there had been no discussion or plan regarding any sexual activity between them that night. Appellant's account was also substantially similar to SW's up to the point that she began dozing off, with certain variations—for example, he described SW telling him about a recent interaction she had with another male cadet, and that Appellant touched SW's hair and scratched her back, events which SW did not include in her account.

However, from the point where SW began dozing off, Appellant's version differed from hers significantly. According to Appellant, he saw that SW was getting tired and told her he was leaving. SW looked up at him, "puckered up," and they kissed. The kiss was not typical of their relationship and surprised him. He moved to the door but only pretended to text his roommate because he was now interested in staying "to see if . . . anything else was going to happen." Appellant asked if he could sit on SW's trunk to wait; she invited him to lie on her bed and continue scratching her back instead. According to Appellant, he got into the bed under the covers and scratched SW's back, which progressed to tickling and then SW rubbing her buttocks against him. SW then rolled over on her back, and Appellant began playing with the waistband of her pants. SW responded by uncrossing her legs and raising her hips, which he took to be an invitation for further contact. Appellant reached into her pants and rubbed her vagina, to which SW responded by breathing heavily. He then inserted his fingers in her vagina, to which SW responded by moaning. After a time, Appellant looked up at SW and spoke her name; she did not respond, and Appellant realized she was not moving. At that point, Appellant asked her twice "[S], are you awake?" and withdrew his hand. SW still did not respond. According to Appellant, he then climbed out of the bed and pulled up the covers. He then nudged SW to see if she would wake up; when she still failed to respond, he gathered the empty alcohol containers in one spot and then departed while SW was still apparently asleep.

## C. Subsequent Events

SW testified that as soon as Appellant left, SW got up, took off her clothes, and threw them in a pile on the floor with her bedding and mattress pad. She then sent text messages to several friends and asked them to contact her. In the morning, one of SW's friends called SW back and met her in her room. SW "tr[ied] to explain what had happened," but was very upset and crying. The friend took SW to a restaurant to eat breakfast and talk, but SW was too upset to eat. SW and her friend then called the Air Force Sexual Assault Prevention and Response (SAPR) office. The SAPR representative directed SW to a local hospital where an Air Force victim advocate met SW and her friend. SW underwent a sexual assault forensic examination later that day.

In the meantime, after Appellant left SW's room, he sent her a text message: "Don't forget you have all those [alcohol] bottles in ur room, don't want someone to see them. You fell asleep and my room mate finished his movie so I dipped."[5] Later on Saturday, 15 April 2017, Appellant used Snapchat[6] to send SW a photo of himself drinking beer. In response, SW blocked Appellant on Snapchat and another application. After Appellant realized SW had blocked him and was not responding to his messages, he sent her the following text on the night of Sunday, 16 April 2017:

> Dude I f[**]ked up, I had been drinking since 7pm that day and I was like a functioning blackout, I didn't even want anything to happen between us. That was super f[**]ked up on my part, I literally just like you as a friend I just do super stupid sh[*]t when I'm in that state of mind.

Appellant immediately followed this with a message reading "I'm sorry," followed three hours later by "[S]?"

On Monday, 17 April 2017, SW reported the sexual assault to the AFOSI. At the agents' suggestion, SW sent Appellant a text message: "I don't know what you want me to say, I barely remember anything and what I do remember is bad, what the f[**]k happened?" Appellant responded: "I'll tell you everything I remember, cause I don't want you to think I'm hiding anything, cause I really didn't mean for any of this to happen and I disrespected you so badly that night, I felt terrible once I realized what was going on." Appellant subsequently texted SW an abbreviated version of his account as described above, insisting he stopped as soon as he realized she was asleep.

## II. DISCUSSION

### A. Military Judge's Denial of the Defense Motion to Suppress

#### 1. Additional Background

##### a. AFOSI Interview

On the evening of 17 April 2017, the day SW reported the sexual assault to the AFOSI, Special Agent (SA) ME and SA SK met Appellant at the AFOSI

---

[5] Unless otherwise marked, texts and other communications quoted in the opinion are presented verbatim without corrections.

[6] At trial, SW described Snapchat as a phone application that allows one to "send pictures to other people with like captions. So you can take a picture of where you are or your face or something and at [sic] a caption to it and send it to multiple people." However, the pictures are not permanently stored on the phone but "go away" after a specified period of time.

detachment for a videorecorded interview. The agents advised Appellant of his rights in accordance with Article 31, UCMJ, 10 U.S.C. § 831. When SA ME asked Appellant, "do you want a lawyer?" Appellant replied, "Uh, yes? I don't know. Like why, why would I need a lawyer?" SA SK then explained to Appellant that "because you requested a lawyer[,] we can't talk to you about the situation for now, ok[ay]." SA SK told Appellant that Appellant might be able to talk to them at some date in the future. SA SK then told Appellant there was some "administrative stuff" they needed to do, and then they would call Appellant's supervising officer to come pick him up.

At that point, Appellant told the agents that he did not know that invoking his rights would "shut it down" and "end the dialog." The agents then told Appellant that if he did want to talk to them, they would take a break, return in a few minutes, re-advise Appellant of his rights, and proceed from that point. The agents then departed the interview room and left Appellant alone for approximately ten minutes. At trial, SA ME testified that this ten-minute break was "standard . . . for [their] detachment."

When the agents returned, SA ME again explained that because Appellant had invoked his right to counsel, the agents could no longer speak with him. The agents then re-advised Appellant of his Article 31, UCMJ, rights. After being re-advised, Appellant indicated he did not want a lawyer and was willing to speak to the agents.

SA ME then asked Appellant if he knew what AFOSI wanted to talk to him about. Appellant responded, "Uhh, I think I might, yes." SA ME then asked Appellant, "Why don't you do me a favor and tell me about that?" The following conversation ensued.

> [APPELLANT (APP):] Ummm. I really don't want to say anything. I would rather just answer like straightforward questions, 'cuz I kind of want to know what's going on. 'Cuz, when you read me my rights you said that I am under suspect or that I am suspected.

> [SA ME:] Okay, so you very clearly understand your rights, you understand you can answer questions, stop at any time, it seems like you really got the gist of it that time?

> [APP:] Yes, sir.

> [SA ME:] Okay. Alright, so you don't want to tell me generally what happened, you just want to answer questions?

> [APP:] Yes, sir.

6

[SA ME:] Okay. So I guess where I would start then is, my first question would be, ummm, who do you think made this allegation?

[APP:] Umm, probably a girl.

[SA ME:] That's correct.

[APP:] Yeah.

[SA ME:] Yeah. Do you know what girl?

[APP:] Yes. Well I think so.

[SA ME:] Tell me about that.

[APP:] I don't know, I don't want to. It's kind of a lame excuse, but I'm just, I don't know, I'm tired and I feel like this just got really serious all of a sudden, because I've had class since 0730 in the morning all the way to the last period, and then I went to practice, and I honest . . . I didn't know at first like what this is for, I thought it was, like, for something else. Because, uhh, I . . . I don't know, I think I know what you're talking about, and I talked, I think to the person, and then I thought that, 'cuz . . . I don't know, it's just a lot, and I'm kind of just intimidated, so it kind of just makes me want to not say anything for my own sake.

[SA ME:] Okay. Well, that's completely your right, right? We explained that to you, very good, now. I am concerned about one thing. Uhhh, have we done something to intimidate you or is it just the situation?

[APP:] The situation. I have never been in like . . . in trouble before.

[SA ME:] Ok, yeah. Because I don't want you to think like we are trying to intimidate you or anything.

[APP:] No.

The interview continued, and Appellant related a version of events as described above.[7] Eventually, Appellant agreed to make a written statement, which was largely consistent with his oral description of the incident and conveyed that he misinterpreted SW's actions as an invitation to sexual behavior. However, it also included admissions of wrongfulness, including *inter alia*: "[I]n a lack of judgement, character, critical thinking, [ ] I performed a sexual

---

[7] Appellant initially told the agents his roommate was with a girl in their room that night, but later admitted to the agents that was not true.

act on [S] without her consent;" "I'm sorry for what I've done, to [S];" "I violated [S];" "In this sexual act I violated [S's] privacy, dignity, and trust. I'm so sorry. I'm so so sorry;" "[I] ignored my better judgment and I hurt [SW]." "I am in the wrong. What I did to [SW] was wrong."

### b. Defense Motion to Suppress

Before trial, the Defense moved to "suppress all statements made by [Appellant] to AFOSI after he exercised his right to remain silent under Article 31, UCMJ and *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)." The motion asserted:

> When initially advised of his rights pursuant to Article 31(b), UCMJ and *Miranda*, [Appellant] invoked. . . . After invoking his rights, [Appellant] continued and indicated that he did not know that invoking his rights would "shut down" the questioning. . . . Due to the fact that [Appellant] seemed not to understand the ramifications of invoking his Fifth Amendment rights, the AFOSI investigators gave [Appellant] a roughly ten (10) minute period of time alone where he could consider whether or not to continue invoking his rights under the Fifth Amendment. . . .

The defense motion acknowledged that after the agents returned and re-advised Appellant of his rights, he "stated that he did not want a lawyer and that he was willing to answer questions – thus *effectively waiving his rights* under Article 31(b) and *Miranda*." (Emphasis added.) The defense motion then quoted verbatim a portion of the subsequent colloquy between SA ME and Appellant set forth above, including Appellant's statement that he felt "kind of just intimidated" which made him "not want to say anything for [his] own sake." The Defense contended Appellant had thereby "asserted his Fifth Amendment right to remain silent in an unequivocal manner." The Defense argued SA ME's response indicated the agents understood this to mean Appellant was invoking his rights.

The Government opposed the motion and contended the totality of circumstances indicated Appellant never unambiguously invoked his Fifth Amendment rights.

The military judge conducted a hearing at which he received evidence, including testimony from SA ME. After SA ME testified and before counsel presented argument, the military judge asked the Defense to clarify the basis for its motion. Specifically, he asked if the question was "whether [Appellant's] statements made after he waived his right to counsel, whether that was an unambiguous invocation of the right to remain silent. Is that -- I mean, are we focusing on the latter half of the interview. Is that correct? Not the initial rights advisement." The civilian trial defense counsel (CDC) replied, "That's correct."

The CDC's subsequent argument focused on the portion of the interview after the ten-minute break, after Appellant was re-advised of his rights, waived them, and then described feeling "intimidated."

The military judge entered a written ruling denying the motion to suppress, which he also read into the record. He characterized the question presented as "a narrow one," and concluded Appellant's statement, "I don't know, it's just a lot, and I'm kind of just intimidated, so it kind of makes me want not to say anything for my own sake," was ambiguous. Applying the objective standard of a reasonable law enforcement officer, the military judge found Appellant's statements indicated he was still considering whether to speak with the agents or remain silent, and that the agents appropriately focused on what appeared to be the reason for Appellant's hesitation "and satisfied his worries prior to continuing the interview." Accordingly, at trial the Government introduced agent testimony regarding Appellant's AFOSI interview, portions of the recorded interview, and Appellant's written statement.

### 2. Law

We review a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hoffman*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted). A military judge commits an abuse of discretion when: (1) the findings of fact upon which the ruling is predicated are not supported by the record; (2) incorrect legal principles are used; or (3) "application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). Under this standard, we uphold the military judge's findings of fact unless they are clearly erroneous or unsupported by the record. *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F. 2007) (citations omitted).

Mil. R. Evid. 304(f)(1) provides: "Motions to suppress or objections under this rule, or Mil. R. Evid. 302 or 305, to any statement or derivative evidence that has been disclosed must be made by the defense prior to submission of a plea. . . . Failure to so move or object constitutes waiver of the objection." "Waiver" under Mil. R. Evid. 304(f)(1) "is not a case where the rule uses the word 'waiver' but actually means 'forfeiture.'" *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citations omitted).

Under Article 66(c), UCMJ, 10 U.S.C. § 866(c), a Court of Criminal Appeals (CCA) has the power to address a legal error in spite of waiver. *United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018); *see also United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) ("[T]he CCAs are required to assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error.").

Servicemembers are generally entitled to the constitutional protections of the Fifth Amendment[8] in addition to those rights afforded by Article 31, UCMJ. *United States v. Tempia*, 37 C.M.R. 249, 253 (C.M.A. 1967). "The Fifth Amendment provides the suspect with protection against self-incrimination when faced with the inherent pressures of any custodial interrogation . . . ." *United States v. Harvey*, 33 M.J. 822, 823–24 (C.M.A. 1991) (citation omitted). "In a custodial interrogation, if an accused indicates that he wishes to remain silent, the interrogation must cease, and if he requests counsel, the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477, 478 (1981). "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85; *see also United States v. Hutchins*, 72 M.J. 294, 297 (C.A.A.F. 2013). However, "the suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). "In order to constitute an unambiguous invocation of the right to counsel, the invocation must be 'sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *United States v. Lovely*, 73 M.J. 658, 672 (A.F. Ct. Crim. App. 2014) (quoting *Davis*, 512 U.S. at 459).

"The invocation of the right to remain silent does not, however, impose a permanent bar against further questioning." *United States v. Delarosa*, 67 M.J. 318, 320 (C.A.A.F. 2009) (citations omitted). Questioning may resume after a request for counsel if "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85; *see also Hutchins*, 72 M.J. at 297. Whether the accused has reinitiated further communications, and whether his waiver of his rights to silence and counsel was knowing and intelligent, "depends upon 'the particular facts and circumstances surrounding [the] case, . . . .'" *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (alteration in original) (quoting *North Carolina v. Butler*, 441 U.S. 369, 374–375 (1979)).

The protections of Article 31, UCMJ, "are in many respects broader than the rights afforded to . . . servicemembers under the Fifth Amendment . . . ." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016). Irrespective of custody, no person subject to the UCMJ "may interrogate, or request any statement from an accused or a person suspected of an offense" without first informing that person of (1) the nature of the allegation and (2) their right to remain silent. Article 31(b), UCMJ; *see Delarosa*, 67 M.J. at 320.

---

[8] U.S. CONST. amend. V.

Mil. R. Evid. 304(a) provides: "If the accused makes a timely motion or objection under this rule, an involuntary statement from the accused, or any evidence derived therefrom," is generally inadmissible. Mil. R. Evid. 304(a)(1)(A) defines "involuntary statement" as "a statement obtained in violation of the self-incrimination privilege of the Fifth Amendment . . . , Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." "When the defense has made an appropriate motion or objection under [Mil. R. Evid. 304], the prosecution has the burden of establishing the admissibility of the evidence." Mil. R. Evid. 304(f)(6).

"A statement obtained from the accused in violation of the accused's rights under Article 31 is involuntary and therefore [generally] inadmissible against the accused . . . ." Mil. R. Evid. 305(c)(1). Mil. R. Evid. 305(c)(2) provides: "*Fifth Amendment Right to Counsel.* If a person suspected of an offense and subjected to custodial interrogation requests counsel, any statement made in the interrogation after such request, or evidence derived [therefrom], is inadmissible against the accused unless counsel was present for the interrogation." Mil. R. Evid. 305(e)(3)(A) provides that once a suspect invokes his Fifth Amendment right to counsel, any subsequent waiver obtained during a custodial interrogation is invalid unless the Government demonstrates by a preponderance of the evidence that either the suspect initiated the communication leading to the waiver, or the suspect has not had his freedom restricted between the initial invocation and the waiver.

### 3. Discussion

Appellant asserts the military judge erred by failing to suppress his statements to AFOSI, but he focuses on a different portion of the interview than did the Defense's motion at trial. At trial, the Defense conceded Appellant effectively waived his rights to counsel and silence after the agents re-advised of his rights following the ten-minute break. The Defense's contention at trial was that Appellant's subsequent comments about feeling "intimidated" was an unequivocal invocation of his Fifth Amendment right to silence. It was this "narrow" question that the military judge addressed and ruled on.

On appeal, Appellant asserts that his initial response when asked whether he wanted a lawyer, "Uh, yes? I don't know. Like why, why would I need a lawyer," was an unambiguous invocation of his Fifth Amendment right to counsel that the agents violated by failing to terminate the interview. The Government contends Appellant waived this issue by failing to raise it at trial. We agree that the issue was waived.

Mil. R. Evid. 304(f)(1) provides that motions to suppress must be entered before pleas or they are waived, except as permitted by the military judge for

good cause. *See Ahern*, 76 M.J. at 197. Trial defense counsel was unambiguously clear that, contrary to Appellant's position on appeal, the Defense was not challenging that Appellant effectively waived his rights after being re-advised following the ten-minute break. Asserting that evidence should be suppressed on one legal basis—in this case, an alleged violation of Appellant's right to remain silent—is not sufficient to preserve a distinct claim that the evidence should have been suppressed on a different theory—in this case, an earlier alleged violation of Appellant's right to counsel. *See, e.g., United States v. Robinson*, 77 M.J. 303, 307 (C.A.A.F. 2018) (holding claims at trial that evidence should have been suppressed for involuntariness and violation of right to silence did not preserve scope of consent claim on appeal). Appellant contends that the record was sufficiently developed and the alleged error sufficiently clear for the military judge to adjudicate the issue. However, the salient point is not the clarity of the issue, but the fact that Appellant elected to waive it.

Yet, this conclusion does not end our analysis. Under Article 66(c), UCMJ, a CCA may pierce an appellant's waiver in order to correct a legal error. *See Hardy*, 77 M.J. at 442–43. Accordingly, we consider the substance of Appellant's argument to determine whether such an exercise of our authority is warranted in this case.

Appellant's theory is that Appellant's statement, "Uh, yes? I don't know. Like why, why would I need a lawyer," was an unambiguous assertion of his right to counsel. The Government concedes that, despite Appellant's hesitant language, the agents treated it as a clear invocation of the right to counsel, and informed Appellant they would terminate the interview. However, we agree with the Government that it was Appellant who then re-initiated the conversation when he expressed surprise that his request would "shut down" the interview and terminate "the dialog." With this understanding, the ten-minute break the agents afforded Appellant did not undermine his invocation of his right to counsel, but was instead intended to give him the opportunity to decide whether he wanted to waive his rights and continue the interview. We note the agents had not only immediately respected his initial indication that he might desire counsel, but also informed Appellant that he would be released soon. Moreover, they did not leave Appellant alone for an indefinite period as a pressure tactic, but informed him they would give him "a few minutes" alone to decide what he wanted to do, which is exactly what they did. Upon being re-advised of his rights, Appellant unequivocally waived his rights and agreed to continue the interview. Accordingly, the totality of the circumstances indicate Appellant's waiver was knowing, intelligent, and voluntary—as the Defense conceded in their motion at trial. Accordingly, we find no cause to pierce Appellant's waiver of this issue.

**B. Ineffective Assistance of Counsel**

**1. Law**

The Sixth Amendment[9] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *Id.* (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

**2. Analysis**

Appellant's claim that he received ineffective assistance of counsel is closely related to issue (1) regarding the defense motion to suppress Appellant's statements to the AFOSI. Appellant contends that if, as we have found, trial defense counsel waived suppression on the grounds of violation of his initial invocation of his right to counsel, then they were ineffective in doing so. However, for reasons explained in our analysis above, Appellant's argument fails all three prongs of the test set forth in *Gooch*. There is a reasonable explanation for trial defense counsel's failure to raise the issue because the totality of circumstances indicate Appellant knowingly and intelligently waived his right to counsel. Accordingly, trial defense counsel's performance was not measurably below professional standards. Finally, there was no reasonable probability of a different result because the evidence did not support the claim. Therefore, Appellant's ineffective assistance of counsel argument must fail.

---

[9] U.S. CONST. amend. VI.

**C. Findings Instructions**

**1. Additional Background**

The military judge's instructions to the court members on findings included, *inter alia*, the following:

> No one in a position of authority over you expects you to return any particular finding in this case. No one is permitted to discover what occurred during your deliberations, what was said by any court member, or how any member voted. As the findings do not require a unanimous agreement, no one will ever know how you voted in this case or whether you concurred with the findings ultimately announced. The findings announced by the panel, regardless of what that is, will have neither a positive nor negative effect on your career. *You are simply required to be fair to both sides*, determine the facts based on the evidence provided, apply the law that I provide to those facts, and not be influenced by outside factors.

(Emphasis added.) The military judge then instructed the court members as follows with regard to the elements of sexual assault:

> To find the accused guilty of this offense, you must be convinced by legal and competent evidence beyond a reasonable doubt of the following elements: one, that at or near the United States Air Force Academy, Colorado, on or about 15 April of 2017, the accused committed a sexual act upon [SW], by penetrating her vulva with his finger; two, *that the accused did so by recklessly causing bodily harm to [SW], to wit: penetrating her vulva with his finger*; three, that the accused did so without the consent of [SW]; and four, that the accused did so with an intent to gratify his sexual desire.

(Emphasis added.)

At the conclusion of his instructions on findings, the military judge asked whether, "other than previously noted . . . counsel object to the instructions given or request additional instructions." The Defense had not previously objected to the instructions quoted above. The CDC responded, "No, Your Honor."

**2. Law**

Generally, we review the adequacy of the military judge's instructions de novo. *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006) (citations omitted). However, the United States Court of Appeals for the Armed Forces (CAAF) has held that when an appellant affirmatively declines to object to the military judge's instructions, the issue is waived. *United States v. Davis*, 79

M.J. 329, 332 (C.A.A.F. 2020) (citations omitted), cert. denied, __ S. Ct. __, 2020 U.S. LEXIS 4468 (5 Oct. 2020). Unlike the CAAF, under Article 66(c), UCMJ, CCAs have the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See Hardy*, 77 M.J. at 442–43.

"Congress clearly intended a general intent mens rea for Article 120(b)(1)(B), [UCMJ,] 10 U.S.C. § 920(b)(1)(B) . . ., sexual assault by bodily harm." *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). "As a general intent offense, sexual assault by bodily harm has an implied mens rea that an accused intentionally committed the sexual act." *Id.* at 381 (citation omitted).

### 3. Analysis

Appellant contends the military judge erred by instructing the court members that they were "simply required to be fair to both sides," and that the Government was only required to prove he penetrated SW's vulva "recklessly" rather than intentionally. He contends both errors unfairly prejudiced him by reducing the Government's burden of proof. However, in light of *Davis*, the CDC's statement that the Defense had no objection to these instructions waived the objection. 79 M.J. at 332.

Recognizing our ability to pierce Appellant's waiver in order to correct an error, we have considered whether such an exercise of our Article 66(c), UCMJ, authority is warranted. We conclude it is not.

We find nothing unfairly prejudicial in the military judge's statement that the court members must be "fair to both sides." The military judge plainly enjoined the members to be fair in the context of ignoring outside influences and applying the law as the military judge explained it, including *inter alia* the Government's burden to prove Appellant's guilt beyond a reasonable doubt. Court members are presumed to follow the military judge's instructions in the absence of evidence to the contrary. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted). The military judge's instruction that the court members be "fair" and not be concerned about opinions of those outside the court-martial does nothing to vitiate that presumption in this case.

With regard to the instruction that the Government must prove Appellant "recklessly" caused bodily harm by penetrating SW's vulva, the Government concedes the military judge erred. However, the Government argues the error benefited the Defense, because the CAAF subsequently held in *McDonald* that sexual assault by bodily harm under Article 120(b)(1)(B), as was charged in this case, is only a general intent crime. 78 M.J. at 379. Appellant counters that the Government confuses mens rea with actus reus, that under general

intent the accused must still have intended the physical act alleged, and therefore the military judge's instruction that the act must have been committed recklessly lowered the burden of proof.

For our purposes, we need not definitively decide whether the military judge's erroneous instruction lowered the Government's burden of proof; it is enough to note the error was harmless. The evidence, including Appellant's own testimony, overwhelmingly indicated that he intentionally penetrated SW's vulva with his finger. That Appellant intentionally committed the sexual act on SW was not contested at trial—instead, the litigated issue was whether he did so with SW's consent or under the reasonable belief that she consented. Therefore, any instruction by the military judge suggesting the Government need only prove Appellant acted recklessly would have had no impact on the members' deliberations. Having considered the entire record, we are confident the trial's outcome would have been the same in the absence of the error.

## D. Cross-Examination of SW

### 1. Additional Background

During cross-examination of SW, civilian trial defense counsel (CDC) engaged in the following colloquy with SW:

> [CDC:] Do you not recall laying on the bed with [Appellant] sitting on one end and you sitting on the other where your head is toward his legs?
>
> [SW:] That may have happened. I may have told [AF]OSI that happened, but like I said, this was two years ago.
>
> [CDC:] So your testimony is today that you don't recall whether you laid on the bed. Is that the case?
>
> [SW:] I'm saying that it's absolutely possible that that happened, but I do not remember.
>
> [CDC:] So it's possible. Does that also mean that you laid there and you let him -- well, and he touched your hair?
>
> [SW:] Yes, that's possible.
>
> [CDC:] Okay. You didn't mention anything about touching your, him touching your hair in today's testimony.
>
> [SW:] I'm telling you that it's possible. I'm telling you I don't remember everything that happened.
>
> [CDC:] Okay. Do you recall saying specifically to [AF]OSI, quote, "I was kind of laying down at that point, he was kind of playing with my hair?" Did you tell OSI that?

[CDC:] Maybe. I'm not sure.

At that point, the CDC informed the military judge that the Defense wanted "to play that portion of the video" of SW's recorded AFOSI interview. In response, the military judge called a recess, which was followed by an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing. At the hearing, the CDC explained the Defense's position that SW's testimony that she "doesn't remember anything" was "a denial." Trial counsel objected and contended the Defense had not established a proper basis for impeachment. The military judge called a ten-minute recess for the parties to research the issue.

After the recess, the CDC cited *United States v. Harrow*, 65 M.J. 190 (C.A.A.F. 2007), for the principle that an inability to recall may be a basis for impeachment for purposes of Mil. R. Evid. 613. However, the military judge found that in this case, SW's testimony that she did not remember was not "inconsistent" with the prior statements to AFOSI for purposes of the rule. The military judge noted that the Defense had previously successfully refreshed SW's recollection regarding another statement during her AFOSI interview, that this "[d]oesn't appear to be a circumstance where she is feigning a lack of memory about certain things," and that SW acknowledged she very well could have told the AFOSI the details the CDC was cross-examining her about.

When the cross-examination resumed, the CDC used the recording of SW's interview to refresh her recollection at several points. In this way, SW ultimately testified that, despite her initial inability to recall portions of her interview, after having her memory refreshed, she told the AFOSI agents Appellant had played with her hair while she lay on the bed; that she told the agents Appellant had grabbed her earlobes without asking permission; and that she told the agents she did not want them to copy pictures that were on her phone.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). A military judge commits an abuse of discretion when: (1) the findings of fact upon which the ruling is predicated are not supported by the record; (2) incorrect legal principles are used; or (3) "application of the correct legal principles to the facts is clearly unreasonable." *Ellis*, 68 M.J. at 344 (citation omitted). "[T]he abuse of discretion standard is strict, 'calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *Erikson*, 76 M.J. at 234 (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)).

"When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness." Mil. R. Evid. 613(a). "Extrinsic evidence of a witness's prior inconsistent statement is admissible

only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Mil. R. Evid. 613(b). "[A]n inability to recall or a 'non-responsive' answer *may* present an inconsistency for purposes of M.R.E. 613." *Harrow*, 65 M.J. at 200; *see also United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993) ("[W]hether testimony is inconsistent with a prior statement is not limited to diametrically opposed answers but may be found as well in evasive answers, inability to recall, silence, or changes of position." (Citations omitted)). "A military judge has considerable discretion to determine if the trial testimony is inconsistent with a prior statement." *Harrow*, 65 M.J. at 200 (citing *Damatta-Olivera*, 37 M.J. at 478) (additional citation omitted).

### 3. Analysis

Appellant contends the military judge abused his discretion by limiting the cross-examination of SW in three respects. We address each contention in turn.

#### a. "Requiring" the Defense to Disclose SW's Prior Statement

First, Appellant asserts "the military judge erroneously required the [D]efense to disclose to SW . . . the contents of her prior statements in violation of Mil. R. Evid. 613(a)." However, the military judge did not "require" the Defense to disclose her prior statements to SW. The military judge freely permitted the CDC to question SW as to whether she had said certain things during her AFOSI interview. After SW testified that she did not remember certain portions of the interview, the CDC *elected* to use the recorded interview to refresh SW's recollection, and thereby demonstrated that she had said certain things during the interview. Appellant's reliance on Mil. R. Evid. 613(a) is inapt, and we find the military judge did not abuse his discretion in this regard.

#### b. Preventing Impeachment with Extrinsic Evidence

Next, Appellant asserts the military judge erroneously prevented the Defense from impeaching SW "with extrinsic evidence of her prior inconsistent statements in accordance with *Harrow* and Mil. R. Evid. 613(b)." Analysis of this claim turns on the meaning of "inconsistent." We begin with the recognition that the military judge has "considerable discretion" in determining whether testimony is inconsistent with a prior statement. *Harrow*, 65 M.J. at 200 (citation omitted). If the military judge's determination is "not arbitrary, fanciful, clearly unreasonable, or clearly erroneous," we will not reverse it on appeal. *Erikson*, 76 M.J. at 234 (citation omitted).

Appellant correctly observes the CAAF has explained that an inability to recall *can be* an inconsistency for purposes of Mil. R. Evid. 613(b). *See Harrow*, 65 M.J. at 200 (citation omitted). However, that does not mean every statement by a witness that she does not recall a prior statement *is* an inconsistency for

such purposes. In this case, the military judge noted SW generally acknowledged that she may well have made the statements the CDC questioned her about, and proved amenable to having her recollection refreshed. This was not a situation where SW appeared to be feigning an inability to recall or otherwise attempting to thwart the Defense's efforts to demonstrate she had made prior inconsistent statements.

In *Harrow*, the CAAF found the military judge "erred when he apparently determined that a failure to remember facts contained in a prior statement cannot be inconsistent with in-court testimony that differs from those facts." *Id.* at 199. However, *Harrow* differs from the instant case in two important respects. First, as the military judge in the instant case noted, in *Harrow* the defense attempted to refresh the witness's recollection, yet the witness continued to maintain he could not remember certain facts or prior statements. *Id.* at 198. In the instant case, SW's memory was easily refreshed with the recorded interview. Second, the CAAF noted the military judge appeared to have categorically discounted that an inability to recall *might* constitute an inconsistency for purposes of Mil. R. Evid. 613. *Id.* at 200. "Consequently, his evidentiary ruling, based on an incorrect understanding of the law, was an abuse of discretion." *Id.* (citation omitted); *see also Ellis*, 68 M.J. at 344. The military judge was explicitly aware of *Harrow* and did not base his ruling on a similar misunderstanding of the law.

We find the military judge did not abuse his discretion when he concluded SW's testimony that she could not recall certain portions of her AFOSI interview—until her memory refreshed—was not the sort of failure of memory the CAAF contemplated as being equivalent to an inconsistency for purposes of Mil. R. Evid. 613(b) when it decided *Harrow*.

Assuming *arguendo* the military judge did abuse his discretion, we find Appellant has failed to demonstrate prejudice. For nonconstitutional errors, the test for harmlessness is "whether [the] error had a substantial influence on the members' verdict in the context of the entire case." *Harrow*, 65 M.J. at 200 (citations omitted). "We consider four factors: (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citing *United States v. Berry*, 61 M.J. 91, 97 (C.A.A.F. 2005)). "When a 'fact was already obvious from . . . testimony at trial' and the evidence in question 'would not have provided any new ammunition,' an error is likely to be harmless." *Id.* (quoting *United States v. Cano*, 61 M.J. 74, 77–78 (C.A.A.F. 2005)). In this case, the materiality of the evidence is determinative. "The materiality of the excluded extrinsic evidence of prior inconsistent statements must be viewed with an eye to its permissible purpose, which was for impeachment only." *Id.* Playing SW's recorded AFOSI interview, as the Defense proposed to do, would have

had the same material effect as SW's refreshed testimony that she had, in fact, made the statements the CDC questioned her about. "The impeachment power of a prior inconsistent statement arises from the conflict between a witness'[s] statements," rather than the form in which the inconsistent statements are brought to the attention of the court members. *United States v. Mote*, No. ACM 39462, 2019 CCA LEXIS 372, at *22 (A.F. Ct. Crim. App. 13 Sep. 2019) (unpub. op.) (citing *Damatta-Olivera*, 37 M.J. at 477).

### c. Preventing Impeachment by Contradiction

Appellant further asserts the military judge erroneously prevented the Defense "from impeaching SW by contradiction." There are two prongs to Appellant's argument.

First, Appellant contends SW was susceptible to impeachment by contradiction on multiple points, but the military judge thwarted such an effort by "forcing" the Defense to disclose the potential contradictions by having her review her prior statements to the AFOSI. However, Appellant's claim fails for reasons similar to his claim that the military judge "required" the Defense to disclose SW's interview before questioning her about her prior statements. The military judge did not "force" the Defense to do such a thing; rather, the Defense elected to demonstrate the inconsistencies by refreshing SW's recollection with discrete portions of the interview.

The second prong involves a different analysis. During cross-examination, the CDC sought to demonstrate SW's direct testimony had downplayed the closeness of her relationship with Appellant. With that purpose, the CDC elicited testimony that SW had operated a social media account under a false name. SW acknowledged the purpose of the account was to "put things on there" that would not be attributable to her personally, and she shared the account only with her "close friends," including Appellant. When the CDC asked SW whether she deleted the account "because [she] believed it would cause [her] to get in trouble," trial counsel objected. The military judge sustained the objection, finding "the probative value . . . is substantially outweighed for [sic] danger of unfair prejudice" under Mil. R. Evid. 403. He instructed the members they could consider that the account existed and SW used it to communicate with her friends, but they must "disregard any testimony regarding any purported violation of cadet rules . . . ."

We find no abuse of discretion in the military judge's application of Mil. R. Evid. 403. The relevance and materiality of the excluded information were very low. The military judge prevented the court members from considering that Appellant may have been aware of some unspecified violations of cadet rules by SW through her false account. The Defense contended SW's willingness to

share such information with Appellant indicated the closeness of their relationship. On appeal, Appellant contends this evidence impeached SW's testimony on direct examination regarding the closeness of her platonic friendship with Appellant. However, in the context of the entire case, the significance of this information was vanishingly small. On direct, SW had testified that she and Appellant had been "really good friends." The court members had already received evidence that SW had directly involved Appellant in other violations of cadet rules, such as soliciting answers to quizzes and drinking alcohol. Moreover, the members were aware SW was comfortable giving Appellant dating advice and inviting him to her room alone to hang out and drink alcohol together. The military judge's conclusion that the probative value of the excluded evidence was substantially outweighed by unfair prejudice was well within the reasonable bounds of his discretion. For similar reasons, even if we assume *arguendo* the military judge erred, having applied the factors set forth in *Harrow* and *Berry* as described above, we find the military judge's Mil. R. Evid. 403 ruling had no substantial influence on the verdict. *Harrow*, 65 M.J. at 200 (citing *Berry*, 61 M.J. at 97).

## E. Trial Counsel Closing Argument

### 1. Additional Background

The senior trial counsel's (STC) closing argument on findings included the following comments on the evidence:

> At 2:00 in the morning, *after drinking a significant amount of alcohol*, and being -- [SW was] probably sick, laying down in her bed. *Common sense tells us that alcohol's a depressant*, and when you're in that position, you're much more likely to fall asleep with alcohol in your system, laying down on your back, eyes closed in a tired position. That's exactly what happened, exactly what you would expect to happen. She closes her eyes and drifts off to sleep. . . .
>
> . . .
>
> Members, when you go back to deliberate and discuss the evidence that you've heard before you this week, one of the instructions that the judge read to you was about credibility of witnesses. It's your duty as members to determine the credibility of witnesses, to listen to their testimony, to weigh what you heard, and come to the determination about the credibility of what they testified to. It's your duty. And when you do that, when you think about what you heard this week, the testimony from the witnesses, *what you will find is that someone got up on that witness stand and lied to you*. Because the versions of the story that you

> heard, the versions of what happened that week cannot exist at the same time. Mutually exclusive. *Someone lied to you.*
>
> . . .
>
> Of course, [Appellant] did disregard the risk that she was sleeping and not responding, *didn't ask her if she was awake*, didn't ask her if she consented, didn't ask if she was into it, didn't try to wake her up, didn't shake her, didn't say anything, didn't talk about it. . . .

(Emphasis added.)

The STC also commented on Appellant's testimony that Appellant and SW had kissed after Appellant initially told her he was going to leave. Specifically, the STC noted that Appellant had omitted this presumably important detail in his text messages to SW when she asked him to tell her what happened, and in his initial recitation of events during the AFOSI interview. During the Defense's argument, the CDC downplayed the significance of these omissions, arguing *inter alia* that "[t]he reality is, when you're being investigated by OSI for a sexual assault, a kiss is not the most important thing in your mind, right? You're like, 'All right. I'm going to get to the sexual assault part, because that's what everybody's focusing on.'" Later in the argument, the CDC returned to the subject of the kiss, commenting:

> And the kiss makes sense when you're talking about touching earlobes, rubbing the hair, the communication, being alone in the room, all of that totally makes sense for a 19-year-old kid to have a little bit of alcohol on board, right? And so that happens and then things change. That's a game changer, right? . . .

The STC's rebuttal argument included the following:

> Now, there was also a lot of talk about the kiss in defense counsel's argument, and one of the things that I wrote down in quotes. The kiss, the kiss, in quotes, "not everything the government makes it out to be." But not a minute later, "The kiss was the game changer." In opening statement, the kiss was the game changer. Defense counsel talked about the kiss. "Listen to the kiss. That has never happened before. The kiss." And all of a sudden, the kiss isn't all the government wants it to be crack -- or it's not all the government's cracked it up to be. Well, it can't be both. It can't be not a big deal because we keep forgetting to use it, and also the game changer that is the basis for the entire reason why I thought that this thing could happen. It is the underpinning of all that we're going to talk about on the stand, but it's also not that big of a deal, because I forget to mention it every

time I tell what happened. Until I go through the story and I think about it and then I go back and I tell it to [inaudible].

In fact, if you even think back to the examination, defense counsel forgot to ask about it and then went back and asked about it. Every time the kiss has been brought up, they tend to go back to bring it up. But it's the game changer. But don't pay too much attention to it. But it's the game changer.

The Defense did not object to any portion of the STC's argument quoted above.

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *Id.* (citation omitted). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (alteration in original) (quoting *Fletcher*, 62 M.J. at 179). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example], a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Id.* at 160 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

Relief for improper argument will be granted only if the trial counsel's misconduct "actually impacted on a substantial right of an accused (i.e., resulted in prejudice)." *Fletcher*, 62 M.J. at 178 (quoting *Meek*, 44 M.J. at 5). "A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "[P]rosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Fletcher*, 62 M.J. at 184. In assessing prejudice from

improper argument, we balance three factors: (1) the severity of the misconduct; (2) the measures, if any, adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *Id.*

### 3. Analysis

Appellant asserts the STC committed four types of prosecutorial misconduct in the portions of his sentencing argument quoted above, resulting in plain error: (1) asserting facts not in evidence; (2) misstating the evidence; (3) disparaging the Defense; and (4) calling Appellant a liar. We consider each claim in turn.

#### a. Asserting Facts Not in Evidence

Appellant takes issue with the STC's assertions that SW consumed "significant amount of alcohol" and that "[c]ommon sense tells us that alcohol's a depressant." We agree with Appellant that "trial counsel is . . . prohibited from injecting into argument irrelevant matters, such as personal opinions and facts not in evidence." *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (citing *Fletcher*, 62 M.J. at 180). However, trial counsel is entitled "to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). The STC's statement that SW had consumed a "significant amount" of alcohol falls into the latter category. It was a reasonable inference and fair comment based on the testimony of SW and Appellant himself regarding SW's consumption of alcohol on the night in question.

Regarding the STC's comment about alcohol being a depressant, Appellant does not contend this suggestion was inaccurate—only that there had been no testimony to that effect. We do not find the STC's suggestion so far outside the bounds of the expected common knowledge or experience of the court members as to constitute "plain or obvious" error that required the military judge's intervention *sua sponte*. Appellant's comparison of this instance with the far more egregious situation in *United States v. Frey*, 73 M.J. 245, 247 (C.A.A.F. 2014), is unpersuasive. In *Frey*, trial counsel's rebuttal sentencing argument invited the court members to "think about what we know, common sense, ways of the world, about child molesters," to counter the fact there was no evidence before the court that the appellant had previously committed similar offenses. *Id.* (Notably, *Frey*'s trial defense counsel objected to this comment but was overruled by the military judge. *Id.* at 248.). In the instant case, the STC did not invite the members to speculate that Appellant had committed other sexual offenses; his suggestion that consuming alcohol would tend to make SW sleepy is not comparable to *Frey*.

### b. Misstating the Evidence

Appellant argues the STC's contention that Appellant did not ask SW if she was awake misstated the evidence, because both Appellant and SW testified Appellant did ask her if she was awake. Again, we are not persuaded. In context, the STC's point was that Appellant did not ask if SW was awake *before he inserted his finger in her vagina*. The testimony of SW and Appellant are both more than sufficient to support the inference that Appellant asked if SW was awake only after committing the sexual act when he either suspected SW might be waking up (in SW's account) or realized that she might be asleep (in Appellant's account).

### c. Disparaging the Defense

Appellant contends the STC's comments about the CDC's argument that the kiss between Appellant and SW was a "game changer" improperly disparaged defense counsel. *See Fletcher*, 62 M.J. at 181–82 (holding trial counsel's argument that trial defense counsel "invented" the appellant's defense was improper). Specifically, Appellant argues the STC "fabricated" the claim that the CDC referred to the kiss as a "game changer," and then proceeded to criticize an argument that was not made. In Appellant's interpretation, the CDC's reference to a "game changer" in the passage quoted above was not a reference to the kiss, but to the other circumstances indicating the "sexual nature" of the interactions: "touching earlobes, rubbing the hair, the communication, [and] being alone in the room." These, he asserts, were the "game changer."

We question Appellant's interpretation of the record. In the context of Appellant's testimony and the STC's initial argument that the claim of a kiss was not credible, the CDC's reference to the other interactions appear intended to show how the claimed kiss "makes sense," and "so that [the kiss] happens and then things change." At a minimum, the STC's interpretation that the kiss was the alleged "game changer" was a reasonable interpretation of the CDC's argument in light of Appellant's testimony, and not fabricated in order to unfairly disparage the Defense. In this light, the STC's argument was a fair comment on the incongruity of the CDC's contention that the kiss was not so significant that Appellant would naturally have included it in his initial descriptions of events, but at the same time was the "game changing" event that led him to believe SW was willing to engage in sexual activity. *See United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) ("[T]he prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense."). The STC may have belabored the point, but an inartful argument is not necessarily an improper one. Again, we find the military judge did not obviously err in failing to intervene *sua sponte*.

### d. Calling Appellant a Liar

Appellant contends the STC's assertion "that someone got up on that witness stand and lied to you" was plain error. He notes the CAAF has explained that disparaging an accused is improper, and in particular stated "calling the accused a liar is a 'dangerous practice that should be avoided.'" *Fletcher*, 62 M.J. at 182 (quoting *United States v. Clifton*, 15 M.J. 26, 30 n.5 (C.M.A. 1983)). In response, the Government notes the STC did not directly call Appellant a liar, but directed his comment toward the evidence where two witnesses testified to incompatible versions of events. The Government contends the STC's argument was not the type of "personal attack on the defendant" that the CAAF found improper in *Fletcher*, but rather "a commentary on the evidence." *Id.* at 183.

We find the STC's use of the term "liar," which by obvious implication referred to Appellant, to be ill-advised. However, under the circumstances, we do not find the STC's comments on the conflicting testimony to be so plainly or obviously erroneous as to obligate the military judge to intervene.

Assuming *arguendo* the STC's comments that someone "lied" were plainly erroneous, we have assessed prejudice by applying the three-factor balancing test set forth in *Fletcher*. *Id.* The brevity of the comments in one paragraph of an argument that spanned 35 pages of the transcript indicates the error was not severe. With regard to corrective measures, the comments passed without objection, and the military judge did not specifically address them at the time or later in his instructions. However, the military judge did give relevant general instructions that the "arguments of counsel are not evidence," and that the members were to decide the "issues in the case on the evidence as [they] remember[ed] it and apply the law" as the military judge instructed them. Furthermore, as discussed below in our consideration of legal and factual sufficiency, the evidence supporting Appellant's conviction was solid. Equally significant, the STC's comments were not of a nature to materially affect the court members' assessment of the evidence. SW and Appellant testified to conflicting and incompatible versions of events; they could not both be correct. Moreover, the STC's argument as a whole made plain the Government's theory that Appellant had lied about the incident. Even if the STC had not used the specific word, the overall impression given to the members would have been the same. Accordingly, even if we assume the STC's comments were improper, weighing the relevant consideration together we are "confident that the members convicted [Appellant] on the basis of the evidence alone." *Id.* at 184.

**F. SW Testimony Regarding Hearsay Statements**

**1. Additional Background**

At trial, the Government offered Prosecution Exhibit 2, consisting of instant messages between Appellant and SW between 14 April 2017 and 17 April 2017, and Prosecution Exhibits 3 and 4, consisting of text messages SW sent to friends on the morning of 15 April 2017 after the sexual assault. The military judge admitted Prosecution Exhibits 2, 3, and 4 without objection from trial defense counsel.[10]

During the Government's direct examination of SW, trial counsel asked SW several questions about Prosecution Exhibits 2, 3, and 4. At one point in Prosecution Exhibit 2, Appellant asked SW whether he should go to the room of a woman he met at the party he was attending, or whether he should return to USAFA. Trial counsel engaged in the following colloquies with SW:

> [Trial Counsel (TC):] So he responds to you and says, "Help advise me." And you say, "On what?" And then, he responds, "Should I go back to the Academy or go to this girl's house and 'drink' with her?" Then your responses, [sic] "Are you trying to smash because if so go to the dorm. If not, and you're tired, then just come back to school." What did you mean by that?
>
> [SW:] Like I said, we were friends. So he was asking me advice for a girl. So I was saying if he wanted to hook up with her, to go hang out with her and if he didn't, then just go back to school.
>
> [TC:] What was going through your mind when he sent you that message, was that unusual?
>
> [SW:] No. He was just asking advice on what to do about a girl. That's what friends do.
>
> . . .
>
> [TC:] Now, later on in the feed, you asked him to send you pictures of the woman that he was talking about. Why did you ask that?
>
> [SW:] Well, he was saying that he doesn't know what he's going to do. So I kind of meant send pictures of her and I'll decide if she's cute enough, help you decide.

---

[10] Trial defense counsel initially objected to Prosecution Exhibit 3 when the Government offered it before opening statements. However, when the Government reoffered Prosecution Exhibit 3 in the course of SW's testimony, trial defense counsel stated the Defense had "no objection."

[TC:]   Okay. And then he responds, "She's no [SW]." How did you take that response?

[SW:]   Just is [sic] like a joke. Like, we were friends. I just took it as a joke.

[TC:]   Did you take it sexually at all?

[SW:]   No, sir.

[TC:]   And that's when you say, "Send pics, I'll decide?"

[SW:]   Yes, sir.

[TC:]   Now, he said, "I want to hang out with you. You're so funny." Again, what went through your mind when you received that text message?

[SW:]   We are just friends. Maybe he just wanted to hang out. Maybe we hadn't seen each other in a while.

. . .

[TC:]   So eventually he says, "I think I'm going to come back. Want me to bring you some Smirnoffs?" And you say, "Yes. I love you. You're my fave." Why did you respond like that?

[SW:]   It was kind of just like, "Yes. I love you. You're my favorite -- because you're going to bring the alcohol, like more to drink."

[TC:]   And was that your plan for the rest of the night?

[SW:]   Just like drinking and watching TV, yeah.

[TC:]   So he responds, "Will you still be awake?" And you say yes or, "Si," right? And then he talks about getting super drunk and falling asleep on the floor of your dorm room, right?

[SW:]   Yes, sir.

[TC:]   So what did you think when he was writing those messages?

[SW:]   That just we were friends and he was going to get really drunk and just pass out.

[TC:]   Now, at this point, did anything sexual pop in your mind?

[SW:]   No, sir.

[TC:]   Was there anything unusual about these text messages?

[SW:]   No, sir.

28

Trial counsel engaged in the following colloquy with SW regarding Prosecution Exhibit 4, which consisted of text messages SW had sent after the assault asking if any of the recipients could come to her room:

> [TC:]    What was going through your mind as you text?
>
> [SW:]  Needed someone to respond. I didn't want to be alone, I didn't know what to do, and that I just wanted anybody to come help me.
>
> [TC:]   And you saying that you didn't want to be alone and you didn't know what to do, what was going through your mind about what had just happened to you?
>
> [SW:]  I didn't understand it. We had been friends and I had just been hanging out with my friend and somehow that had turned into me getting sexually assaulted and I didn't know if I should go to the hospital. I didn't know who I should call. I just didn't know what to do.

Trial defense counsel did not object to any of the testimony quoted above.

**2. Law**

In general, "[w]e review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). However, when the defense fails to make a timely objection to the admission of specific evidence, the issue is forfeited and we review for plain error. *See United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted). Under the plain error standard of review, the "[a]ppellant has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *Id.* (citation omitted).

"Whether an accused has waived an issue is a question of law we review de novo." *Ahern*, 76 M.J. at 197 (citation omitted). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Id.* (citation omitted). "[U]nder the ordinary rules of waiver, [an a]ppellant's affirmative statements that he had no objection" to the admission of evidence "operate[s] to extinguish his right to complain about their admission on appeal." *Id.* at 198 (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009) (finding waiver where the appellant "affirmatively stated that he had 'no objection' to the evidence" and used the evidence in his argument)).

Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Otherwise ad-

missible relevant evidence may be excludable if its probative value is substantially outweighed by countervailing dangers, including *inter alia* unfair prejudice or confusion of the issues. Mil. R. Evid. 403.

### 3. Analysis

On appeal, Appellant contends the military judge committed plain error with regard to Prosecution Exhibits 2, 3, and 4 in two respects. First, he contends the military judge plainly erred by admitting SW's hearsay statements in these exhibits "without exception or limitation." Second, he contends the military judge plainly erred by permitting SW to testify regarding these hearsay statements, as detailed above.

With regard to the admission of the exhibits themselves, we find Appellant waived this issue when trial defense counsel affirmatively told the military judge the Defense had "no objection" to these exhibits. We acknowledge our authority under Article 66(c), UCMJ, to pierce Appellant's waiver in order to correct a legal error. *See Hardy*, 77 M.J. at 443. We find no cause to do so here. To the extent Prosecution Exhibits 2, 3, and 4 included hearsay statements by SW, it is evident trial defense counsel made a conscious decision not to object, and the military judge was not obligated to exclude them *sua sponte* on behalf of the Defense.

With regard to SW's testimony about these exhibits, because trial defense counsel failed to object we review for plain error. Appellant contends SW's testimony regarding what she thought when she sent these messages was irrelevant "to prove any element of the offense." We disagree. Relevance is a "low threshold." *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010). The Government was required to prove Appellant's penetration of SW's vulva was without her consent. At the point SW testified, it was already apparent that one of the Defense's primary theories was that SW actually consented to the sexual act. Therefore, SW's expectations and intent during the events leading to Appellant's arrival at her dormitory room were relevant to establishing whether the sexual encounter was consensual. In particular, SW's testimony clarifying that her messages to Appellant in which she offered advice regarding another woman, expressed affection for Appellant, and invited him to her room to drink alcohol did not signify any romantic or sexual interest on her part, had some tendency to make a consensual sexual encounter less probable than the evidence might otherwise indicate. Similarly, SW's feelings of confusion and distress and requests for assistance immediately after the incident had some tendency to indicate she had not consented.

Appellant further argues that even if SW's "mental processes during the communications" had some relevance, the "danger of unfair prejudice, confusing of the issues, and misleading the members in this case far outweighed any

probative value in SW's editorial commentary," and therefore the military judge should have excluded it pursuant to Mil. R. Evid. 403. However, Appellant fails to explain how SW's testimony was unfair, confusing, or misleading. We conclude such concerns did not substantially outweigh the probative value such that the military judge's failure to intervene *sua sponte* was an obvious error. Accordingly, Appellant has failed to meet his burden to demonstrate plain error.

## G. Record of Trial

### 1. Additional Background

Appellant was arraigned 14 November 2018, and the military judge held a motions hearing on 3 January 2019 before the trial took place from 28 January 2019 until 1 February 2019. According to the court reporter's chronology included with the record of trial, the court reporter received a signed authentication of the record from the military judge on 25 June 2019.[11] The staff judge advocate recommendation (SJAR) was signed the same day. However, the chronology includes the following annotation for 27 June 2019: "[Noncommissioned officer in charge] of Mil[itary] Justice at USAFA contacted me regarding exhibits from prior arraignment and motions hearing. USAFA [legal office] is working on getting them transcribed and sent to me to merge with my transcript and make a complete record . . . ."[12] A subsequent chronology entry dated 29 July 2019 indicates the court reporter received and "merged" the arraignment and motion hearing transcripts with the trial transcripts.

---

[11] Neither Appellant nor the Government addressed whether this chronology is part of the "record" as defined in R.C.M. 1103(b)(2) or are "matters attached to the record"—also referred to as "allied papers"—under R.C.M. 1103(b)(3). *See United States v. Jessie*, 79 M.J. 437, 440–41 (C.A.A.F. 2020). We note Air Force Instruction 51-201, Administration of Military Justice, ¶ A11.2.2 (18 Jan. 2019), and Air Force Manual 51-203, Records of Trial, Atch. 2 ¶ 3 (4 Sep. 2018), call for the inclusion of the court reporter chronology in the record of trial. Moreover, trial defense counsel's clemency memo to the convening authority, described below, which is part of the record, includes similar information and appears to be based in part on the chronology. The CAAF in *Jessie* declined to disturb a line of its precedent that has "allowed the CCAs to supplement the record when deciding issues that are raised by materials in the record." *Jessie*, 79 M.J. at 442. Additionally, both parties refer to the chronology in their filings, and neither party has raised any objection respecting the chronology. *Cf. United States v. Stanton*, ___ M.J. ___ , No. 19-0449, 2021 CAAF LEXIS 28, at *5 n.2 (C.A.A.F. 13 Jan. 2021) (considering discharge request and action upon it without deciding whether they were part of the record because parties did not object). Accordingly, we consider the court reporter chronology in our analysis of this issue.

[12] Three different court reporters had been detailed to record the arraignment, motions hearing, and trial.

The military judge's authentication included in the record of trial is dated 29 July 2019. The record does not include an authentication dated 25 June 2019, nor does it include a certificate of correction by the military judge.

The record of trial including the merged transcript and SJAR were served on Appellant and trial defense counsel on 3 August 2019 and 6 August 2019, respectively. Trial defense counsel's clemency memorandum on behalf of Appellant, dated 15 August 2019, asserted *inter alia*:

> Part of the unreasonable delay in post-trial processing was a result of the [G]overnment's failure to transcribe and authenticate the audio recording from the motions hearing held on 3 January 2019. On 25 June 2019, prior to the [G]overnment recognizing such oversight, the Military Judge authenticated the record. On 27 June 2019, the [G]overnment recognized it was missing [the] record of the 3 January 2019 motions hearing. The transcript of the 3 January 2019 session was provided to the Court Reporter, without a certificate of correction from the Military Judge. Without a certificate of correction, the 3 January 2019 session is not part of the record and the record is therefore incomplete.

As a result of this and other asserted errors, trial defense counsel requested the convening authority grant clemency by retroactively approving deferment of Appellant's forfeitures of pay and allowances.

The staff judge advocate's undated addendum to the SJAR noted trial defense counsel's assertion that the absence of a certificate of correction was a legal error; however, the staff judge advocate advised the claim was "without merit," without providing further analysis.

### 2. Law

The proper completion of post-trial processing is generally a question of law we review de novo. *United States v. Zegarrundo*, 77 M.J. 612, 613 (A.F. Ct. Crim. App. 2018) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). Whether a record is complete and a transcript is verbatim are also questions of law we review de novo. *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014).

Article 54(a), UCMJ, 10 U.S.C. § 854(a), provides that the record of trial "shall be authenticated by the signature of the military judge." The military judge's signature "authenticates only the transcript of trial proceedings held by and before the trial judge." *United States v. Eubank*, 12 M.J. 752, 756 (A.F.C.M.R. 1981). Rule for Courts-Martial (R.C.M.) 1104(d)(1) provides that a "record of trial found to be incomplete or defective after authentication may be

corrected to make it accurate." R.C.M. 1104(d)(2) further provides "[a]n authenticated record of trial believed to be incomplete or defective may be returned to the military judge . . . for a certificate of correction."

Article 59(a), UCMJ, 10 U.S.C. § 859(a), provides a "finding or sentence of court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."

### 3. Analysis

On appeal, Appellant renews the claim that the record of trial is incomplete and the transcript is not verbatim. Therefore, he contends, this court should apply R.C.M. 1103(f), and approve only so much of the sentence as could have been adjudged by the special court-martial, excepting the bad-conduct discharge. We find no relief is warranted.

To begin with, we find R.C.M. 1103(f) inapt because this is not a situation where "a verbatim transcript cannot be prepared" due to "loss of recordings or notes, or other reasons." R.C.M. 1103(f)(1). A verbatim transcript has been prepared and authenticated by the military judge, and Appellant does not allege that the court's copy of the record of trial is *substantively* incomplete in any way. Instead, the military judge prematurely authenticated a portion of the transcript without having received the entire transcript of proceedings. Once he received the entire transcript, which trial counsel and trial defense counsel also received and reviewed, the military judge authenticated the entire transcript, and that authentication is the only authentication included in the record. Moreover, the complete authenticated record is the record that was served upon Appellant and his counsel prior to submission of clemency matters.

We acknowledge, without holding, that under R.C.M. 1104(d), a certificate of correction may have been the appropriate mechanism to address the military judge's premature authentication of a portion of the record. However, we find no material prejudice to appellant's substantial rights, and therefore no grounds to grant relief. We separately address the related issue of facially unreasonable post-trial delay below; however, we find no basis to conclude the military judge's re-authentication of the record rather than issuing a certificate of correction exacerbated the delay or otherwise prejudiced Appellant.

### H. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018)).

In order to convict Appellant of the specification of sexual assault in violation of Article 120, UCMJ, charged in this case, the Government was required to prove: (1) that at or near the USAFA, on or about 15 April 2017, Appellant committed a sexual act upon SW by penetrating her vulva with his finger; (2) that Appellant did so by causing bodily harm, to wit: penetrating SW's vulva with his finger without her consent; and (3) Appellant did so with the intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 45.b.(4)(b).

The defense of mistake of fact as to consent would apply if Appellant, because of ignorance or mistake, incorrectly believed that SW consented to the sexual act. *See* R.C.M. 916(j)(1). In order to rely on a mistake of fact as to consent defense, Appellant's belief must have been reasonable under all the circumstances. *See id.*; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (citation omitted). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 379.

### 2. Analysis

Appellant contends the Government failed to prove beyond a reasonable doubt that SW did not actually consent to the sexual act or, in the alternative, to disprove that Appellant reasonably believed she consented. We disagree.

The primary evidence supporting Appellant's conviction was the testimony of SW. As described above, SW testified that in the early morning of 15 April 2017, in her USAFA dormitory room, Appellant penetrated her vagina with his fingers without her consent, thereby satisfying the elements of the charged sexual assault. Other significant evidence reinforced SW's testimony. The Government introduced Appellant's 16 April 2017 text messages to SW, in which he apologized to SW, admitted what he had done was "super f[**]ked up," and attributed his behavior to being drunk. The Government also introduced Appellant's statements to AFOSI, including admissions that he acted "without [SW's] consent" and "violated [SW's] privacy, dignity, and trust." The Government called as witnesses two of SW's friends who testified that she appeared genuinely distraught during the day following the sexual assault. SW's prompt report of the sexual assault also tended to reinforce her credibility. A reasonable factfinder could conclude the evidence established every element of the offense beyond a reasonable doubt.

Appellant's argument relies heavily on his trial testimony. We note again that Appellant's testimony corroborates SW's account in many respects, including *inter alia* the platonic nature of their relationship prior to 14 April 2017 and that there was no expectation of sexual activity that night. Appellant also confirmed the sexual act itself—his digital penetration of SW's vulva. However, Appellant's claims that tend to indicate SW consented, or that he reasonably believed she did so, including his claims that she invited his kiss, invited him to get into her bed, engaged in tickling, rubbed her buttocks against him, and responded positively to his rubbing and penetrating her vagina, are less convincing. Apart from the fact that they are manifestly self-serving and contradicted by SW, they are undermined by his subsequent repeated admissions of wrongfulness. In addition, Appellant's credibility is damaged by his admissions that he deceived SW about not being able to return to his room, a lie that he initially repeated to the AFOSI agents. A reasonable factfinder could find Appellant's account unconvincing, and find instead that Appellant contrived an excuse to remain in SW's room while she slept, and then exploited her trust and vulnerability to commit the sexual act without her consent.

Appellant's attacks on SW's credibility do not substantially sway our analysis of the evidence. He argues that SW is not credible because in her testimony she initially downplayed the closeness of their former friendship. This is true to a degree; however, SW and Appellant substantially agreed on the most ma-

terial points—that their relationship was essentially platonic, and neither anticipated any sexual activity when Appellant went to SW's room that night. Appellant also labels as "totally false" how SW characterized the incident to others, when she told one cadet that she "was raped" and another that she woke up to Appellant "having sex with her." However, these characterizations by a lay witness of a digital nonconsensual sexual act, although perhaps misleading without further detail, do not impugn our impression of SW's credibility, particularly where SW and Appellant explicitly agree on what the specific sexual act was. Other minor inconsistencies Appellant asserts in SW's statements and testimony are simply unpersuasive.

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

## I. Post-Trial Delay

Appellant's court-martial concluded on 1 February 2019. However, the convening authority did not take action until 20 August 2019. This 200-day period exceeded by 80 days the 120-day threshold for a presumptively unreasonable post-trial delay the CAAF established in *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Accordingly, although Appellant has not raised the issue in his assignments of error, we have considered the four factors the CAAF identified in *Moreno* to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *Id.* (citations omitted).

In *Moreno*, the CAAF identified three types of prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, the post-trial delay did not result in oppressive incarceration because Appellant had already completed his term of confinement before the sentence was approved. Moreover, there is no oppressive incarceration where the appellant does not prevail on the substantive grounds of his appeal, as Appellant has not prevailed in the instant appeal. *Id.*

at 139. Similarly, where Appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired, and we cannot perceive how any ground for appeal has been materially impaired. *Id.* at 140. With regard to anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has made no claim or showing of such particularized post-trial anxiety or concern in this case, distinct from that experienced by other appellants convicted of sexual assault, and we perceive none.

Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In this case, the delay was primarily attributable to the trial court reporter's workload, complicated by the length of the transcript and size of the record of trial in this case. For the reasons mentioned in the court reporter chronology and trial defense counsel's clemency submission, as described above in relation to Appellant's claim that the record is incomplete, it appears that inefficient coordination of the efforts of the three court reporters involved in this court-martial may have caused an unnecessary delay of a month or more in the preparation of the record. However, in the absence of cognizable prejudice as identified in *Moreno*, we do not find the delay so egregious as to adversely affect the public's perception of the *fairness* or *integrity* of the military justice system.

Recognizing our authority under Article 66(c), UCMJ, we have also carefully considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After evaluating the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), in the absence material prejudice to Appellant, we conclude no such relief is warranted.

## J. Action on Deferment Request

On 15 February 2019, two weeks after the conclusion of his court-martial, pursuant to Article 57(a)(2), UCMJ, 10 U.S.C. § 857(a)(2), Appellant through counsel requested deferment of his adjudged and automatic forfeitures of pay and allowances. The stated rationale for the request was: (1) deferment would "allow [Appellant] to save money so that he can attempt to be somewhat financially stable once released from confinement;" and (2) the community's interest in imposition of punishment would be adequately served by Appellant's term of confinement, dismissal, and sex offender registration. On 21 February 2019, the convening authority summarily denied the request without stating a reason.

We review a convening authority's denial of a deferment request for an abuse of discretion. *United States v. Sloan*, 35 M.J. 4, 6 (C.M.A. 1992) (citing R.C.M. 1101(c)(3)), *overruled on other grounds by United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018). "When a convening authority acts on an [appellant]'s request for deferment of all or part of an adjudged sentence, the action must be in writing (with a copy provided to the [appellant]) and must include the reasons upon which the action is based." *Id*. at 7 (footnote omitted); *see also* R.C.M. 1101(c)(3), Discussion ("If the request for deferment is denied, the basis for the denial should be in writing and attached to the record of trial.").

Under *Sloan*, the convening authority's failure to state his reasons for denying the requested deferment of forfeitures was an error. *See* 35 M.J. at 7. However, under the circumstances of this case, we do not find prejudice from the error. Appellant's justification for the requested deferment was weak. Appellant had no dependents, needy or otherwise, and articulated no other particular compelling financial need. His explanation was essentially the obvious point that granting the deferment would result in him having more money, which would be beneficial to Appellant. Considering the deferential abuse of discretion standard of review applicable to such decisions by the convening authority, and Appellant's acknowledged burden to demonstrate his interests *and* those of the community are better served by deferment rather than imposition of punishment on the effective date, *see* R.C.M. 1101(c)(3), in the absence of any indication the convening authority entertained an improper rationale, we find in this case Appellant's material rights were not substantially prejudiced by the convening authority's failure to state his reasons.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court